## Cronise *versus* Cronise.

1. The constitution is not to be interpreted as a private writing, by rules of art, but in the light of ordinary language, the circumstances attending its formation and the construction placed upon it by the people.

2. Special divorce laws are legislative acts and primâ facie are founded on sufficient cause not within the jurisdiction of the courts; this cause is inquirable into as a fact when not set forth in the act.

3. The restrictions in the amendments to the constitution, are a recognition of the power of the legislature to grant divorces outside of the restrictions.

4. The provisions in the Federal and state constitutions forbidding the impairing of the obligation of contracts, does not prevent a severance of the marriage relation by consent or by the courts for cause.

5. In declaring a dissolution of marriage, the presumption is that the legislature acts upon sufficient cause.

6. The power of the legislature to pass a divorcing law being legislative, the judicial quality is merged and notice is unnecessary because it is a law and not a decree.

7. The power to the legislature to grant divorces being limited by the constitution to certain grounds, an inquiry into them is a necessary duty under the bill of rights to prevent injustice.

8. If the boundary of a limited power be overstepped by the legislature, its act is void and must be inquired into.

9. Jones *v.* Jones, 2 Jones 350, affirmed.

10. The presumption is that every legislative act of divorce is for a just cause, but it is not a conclusive presumption that the case is outside the jurisdiction of the courts.

[Library stamp]

[Cronise *v.* Cronise.]

January 28th and February 8th 1867.    Before WOODWARD,
C. J., THOMPSON, STRONG, READ and AGNEW, JJ.

This was an appeal from Nisi Prius, in Equity.

Titus F. Cronise was complainant in the bill, and Estella
Cronise, late Dallett, and Henry C. Dallett, were defendants.
The hearing was upon bill, answer, replication and proofs. READ,
J., dismissed the bill, and the complainant appealed.

The bill set out that the complainant was, on the 29th of
November 1860, married to Estella, one of the defendants; that
being unable to meet his business liabilities, in January 1861,
with the consent and approval of his wife and her father, the
other defendant, who assisted him with money to pay his passage,
he went to California to endeavor to restore his business; that
he looked to returning home, and remitted means as he was able
for her support; that in April 1864, without notice to him, his
wife, combining with her father, petitioned the legislature of
Pennsylvania, representing that the plaintiff had fraudulently
deceived her and entrapped her into the marriage; and that when
she knew of the fraud, she repudiated the marriage so far as she
could, and refused to have further correspondence with him.
The bill further sets forth that, without any notice to him, the
legislature passed an act to divorce his wife from him; that the
subject-matter of the complaint is within the jurisdiction of the
Court of Common Pleas, and the act is therefore unconstitutional
and void; that the proceeding being ex parte, and in fraud of
his marital rights, is on that account also illegal and void. The
bill averred that Estella, under the act, alleges she is not his
wife, and refuses to cohabit with him: claims the right to con-
tract another marriage, &c.

He prayed for an injunction to restrain the defendants "from
setting up or pleading the said Act of Assembly in bar of the
conjugal rights of your orator, and that the said Estella may be
restrained from acting, or claiming to act, as a single or unmar-
ried woman, or denying that she is the wife of your orator; or
from contracting any other marriage; and that your Honors would
be pleased to decree and pronounce, that the aforesaid Act of
Assembly is unconstitutional and void, and so restore your orator
to his conjugal rights as husband of the said Estella."

The Act of Assembly referred to in the bill was passed April
29th 1864, and is as follows:—

"The marriage contract entered into between Titus Fey Cro-
nise and Estellina Cronise be and the same is hereby annulled and
made void, and the parties released and discharged from said
contract and from all duties and obligations arising therefrom, as
fully and absolutely as if they had never been joined in marriage."

The defendants answered, that in December, after the marriage
of the complainant, criminal proceedings were instituted against

[Cronise v. Cronise.]

him for obtaining money on false pretences; that he secretly left Philadelphia, and went to California; that after the knowledge by his wife of his crimes, she ceased to correspond with him; that being advised that the courts had no power to grant a divorce, she applied to the legislature of Pennsylvania, the allegations in her petition being true; that the counsel and agents of both parties were heard before the Committee on Divorces, who reported the bill which became a law; and is constitutional and valid. Estella further averred that the complainant had never invited her to cohabit with him, nor had pretended that he was able to maintain her; that two years after their separation, and after she had determined to have no more intercourse with him, he sent three or four drafts for $33 each, which she returned, preferring to be dependent on her father, and that he knew what her purposes were long before her application to the legislature, and that he had counsel employed to watch her movements in reference to obtaining a divorce.

The memorial of Estella to the legislature alleged, that long-continued and artfully planned deceits were practised upon her by her husband and others connected with him to entrap her into a marriage; that his criminal practices before and after marriage, of which she was then ignorant, rendered him liable to punishment under the law, made continued cohabitation with him impossible and forced him to concealment and escape. The memorial then alleges circumstances as the grounds of the charges, averring in conclusion that "being kept in ignorance by her family and friends of the main facts attending the escape of her said husband and the causes of it, now and for a year past she has held no correspondence with him; and fully convinced of his utter depravity as a gentleman and man of honor, and ever since her marriage, as before, having been dependent upon her father for support, can never again consent to cohabit with him as a wife, and, although now separated from him for over three years, she has never been requested by him to do so."

There was much evidence taken, some in relation to the proceedings before the legislature; some relative to the transactions of the complainant; his arrest on allegations of fraud, and his going to California: four letters from his wife, the first June 8th 1861, the last March 10th 1862, were also in evidence.

The case having been argued, was directed to be reargued, and on the reargument the question of jurisdiction was discussed first and separately.

*W. H. Drayton*, for appellant.—If the courts have no jurisdiction here, the legislature in a matter where their jurisdiction is limited by the constitution, may act as if it were general and

[*Cronise v. Cronise.*]

divorce a man for no cause or for a cause of which the courts have jurisdiction and he will be without remedy.

The validity of a divorcing act has been considered in an action of ejectment: Jones *v.* Jones, 2 Jones 350. The court can restrain acts contrary to equity as well as law: Stockdale *v.* Ullery, 1 Wright 486.

A married man has a legal right to the society and assistance of his wife, and can recover damages from any one who interferes with it. May a wife violate it with impunity?

This action is analogous to a suit for the restitution of conjugal rights, and spiritual courts compel mutual cohabitation: Poynter on Marriage and Divorce, ch. 17, 19 (13 Law Lib.)

Acts of the legislature may be declared unconstitutional by the judiciary: 1 Bl. Com. 162, Sharswood's note 15; State *v.* The Governor, 1 Dutcher (N. J.) 351; Pacific Railroad *v.* The Governor, 23 Miss. 353, 362; Huston Railway Co. *v.* Randolph, 24 Texas 317, 332; People *v.* New York, 37 Barb. 35; Erie and N. E. Railroad *v.* Casey, 2 Casey 316; Act of 13th June 1840, § 39, Purd. 402, pl. 5, Pamph. L. 671.

*W. A. Porter,* for appellee, cited Hulseman *v.* Remis, 5 Wright 396; Ewing *v.* Thompson, 7 Id. 372; Kneedler *v.* Lane, 9 Id. 238; Kerr *v.* Trego, 11 Id. 292.

*G. M. Wharton,* for appellant, in reply, cited 1 Spencer Eq. Jur. 598, 702; 2 Story Eq. Jur. 1425 *et seq.*; 2 Russell 21; Ex parte Sandiland, 12 E. L. & Eq. 463; Connelly *v.* Connelly, 2 Id. 570.

The court afterwards ordered an argument on the principal question.

*W. H. Drayton* and *G. M. Wharton,* for appellants.—1. Had the legislature jurisdiction? 2. If the legislature had jurisdiction, is an act passed without notice to the complainant, or any opportunity afforded to him of being heard and depriving him of a vested right, constitutional and valid?

1. "The legislature has not power to enact laws annulling the contract of marriage, where, by law, the courts of this Commonwealth are, or may hereafter be empowered to decree a divorce:" Const. Pennsylvania, Art. 1, § 14. Also, Amend. of 1864, Art. 11, § 9.

No *ex post facto* law nor any law impairing contracts shall be made: Art. 9, § 17.

The clause of the constitution calls it "*the contract of marriage.*"

[Cronise v. Cronise.]

It is a favored *contract:* Story's Conflict of Laws, § 108; 1 Black. Com. 448; Jones v. Jones, 2 Jones 354.

Whether, under this clause in the constitution, the legislature can do more than enact general laws, may be questioned.

"But, if special acts may be passed, it is only where both are consenting or one has broken the contract in some way not provided for by laws already enacted:" Bartholomey v. Johnson, 3 B. Monroe 90; Dartmouth College v. Woodward, 4 Wheat. 696.

There is nothing on the face of the act to show on what grounds the divorce was granted.

If the allegations in Mrs. Cronise's memorial were true they brought her case directly within the jurisdiction of the Court of Common Pleas: Acts of 8th May 1854, § 1, Purd. 346, pl. 7, Pamph. L. 644; March 13th 1815, § 1, Purd. 345, pl. 1, 6 Sm. L. 286.

2. The legislature, in cases of divorce, acts judicially: Jones v. Jones, 2 Jones 353–4.

A sentence against one whose presence was not subject to the jurisdiction would be void on the plainest principles of natural law: Pender v. Graham, 4 Florida 46; Brown v. Hummell, 6 Barr 86–7.

Notice to the defendant, actual or constructive, is essential to the jurisdiction of all courts: Webster v. Reid, 11 Howard 460; Nations v. Johnson, 24 Id. 203; Boswell's Lessee v. Otis, 9 Id. 350.; Baldwin v. Hall, 1 Wallace U. S. 233–4; Oakly v. Aspinwall, 4 Comstock 521.

Marriage, as a contract, is protected by the Constitution of the United States: Const. U. S. Art. 1, § 10.

The Act of April 19th 1864, in question, impairs, by annulling, the contract between Titus F. Cronise and Estellina Dallett. The act is therefore void, and the contract still stands good. The parties to it are yet man and wife. There is neither reason nor law which gives the legislature of a state peculiar power over the contract of marriage.

Marriage is a contract which has a stronger tie than other contracts, because even the parties to it cannot dissolve it by common consent: Story Confl. Laws, § 108, n. 3.

*J. Hemphill* and *W. A. Porter,* for appellees.—No notice to persons whose interest may be affected by legislation is required to give effect to the laws passed. The constituency being all represented, are presumed to have their interests properly attended to.

The complainant having put himself out of the reach of personal service by his own improper conduct, he has no right to complain of want of notice: Wright v. Wright, 2 Maryland Rep. 429. Jones v. Jones, 2 Jones 354, only established that

[Cronise *v.* Cronise.]

where the rights of parties depend on the validity of a divorce granted by the legislature, evidence is admissible to show that the causes for which it was granted were within the jurisdiction of the courts. Outside of the jurisdiction given to the courts, the legislature is as supreme as Parliament, and may divorce in such cases without accountability to or control by any other power.

The provision of the Constitution of the United States that "no state shall pass any law impairing the obligation of contracts," does not impair the power of a state legislature over the subject of divorce: see Butler *v.* Pennsylvania, 10 How. 402; White *v.* White, 5 Barb. N. Y. R. 477, 481; Noel *v.* Ewing, 9 Indiana R. 38; Melizet's Appeal, 5 Harris 449; Dartmouth College *v.* Woodward, 4 Wheat. 629; Maguire *v.* Maguire, 7 Dana's K. R. 181; Dickson *v.* Dickson, 1 Yerg. (Tenn.) R. 110; Starr *v.* Pease, 8 Conn. R. 541; Crane *v.* Meginnis, 1 Gill & Johnson's Maryland R. 463.

Marriage differs from other contracts in that the rights, obligations or duties arising from it are not left entirely to be regulated by the agreement of parties, but are, to a certain extent, matters of municipal regulation over which the parties have no control by any declaration of their will: Bishop on Divorce, pl. 31–34, 36, 36(a), 771, 774, 776, 784–788, 790, 791, 794; Story on Conflict of Laws, § 108, note, 200, 201; Levin *v.* Sleator, 2 Greene (Iowa) 604. Have the courts jurisdiction of such a case? Constitution of Pennsylvania, Art. 1, § 14; Acts of March 13th 1815, § 1, Purd. 345, pl. 16, Sm. L. 286; May 8th 1854, § 1, Purd. 346, pl. 7; Hoffman *v.* Hoffman, 6 Casey 417; 2 Kent Com. 77; Wakefield *v.* Mackay, note to Wilson *v.* Brockley, 1 Phillimore 137; Benton *v.* Benton, 1 Day 111; 1 Stair's Institutions by More, p. 14; Shelford on Marriage and Divorce 222 (33 Law Library 184); 2 Haggard's Consist. R. 182, 248; Fletcher *v.* Peck, 6 Cranch 87.

The opinion of the court was delivered, March 11th 1867, by

AGNEW, J.—The argument in this case questioned the authority of the legislature to grant divorces. It is objected that the power is judicial and not within the legislative authority conferred in the first article of the state constitution—that being judicial it cannot be exercised without notice—and it is prohibited by the clause in the bill of rights, and that in the Federal Constitution forbidding contracts to be impaired.

If the power be conferred upon the legislature to grant divorces, it cannot be reasoned away by analysis. It is then a fact, not a deduction. I repeat a common thought when I say, that a constitution is not to be interpreted as a private writing

[Cronise v. Cronise.]

by rules of art which the law gives to ascertain its meaning, but is to be studied in the light of ordinary language, the circumstances attending its formation, and the construction placed upon it by the people whose bond it is. Judged by these tests, special divorce laws are legislative acts. This power has been exercised from the earliest period, by the legislature of the province, and by that of the state under the Constitutions of 1776 and 1790. The Constitution of 1790 was framed in view of this practice. The continued exercise of the power after the adoption of the Constitution of 1790, cannot be accounted for, except on the ground that all men, learned and unlearned, believed it to be a legitimate exercise of the legislative power. This belief is further strengthened by the fact that no judicial decision has been made against it. *Communis error facit jus*, would be sufficient to support it, but it stands upon the higher ground of contemporaneous and continued construction by the people, of their own instrument. It has a still higher basis. The people finding defects in the Constitution of 1790, voted in 1836 to reform it. The unlimited power of the legislature on the subject of divorce, was proposed for reform, and discussed in the convention. The result was the amendment to be found in the 14th section of the 1st article of the amended constitution. "The legislature shall not have power to enact laws annulling the contract of marriage in any case where, by law, the courts of this Commonwealth are, or may hereafter be empowered to decree a divorce." This section was placed by the convention in the first article as a restriction upon the grant of legislative power. It is, therefore, a clear recognition of the power, outside of the restriction.

Being now a part of the constitution, and a later expression of the popular will, the amendment qualifies and restricts the operation (if any it had before) of the 17th section of the 9th article, declaring " that no *ex post facto* law, nor any law impairing contracts, shall be made." The legislative character of the power is shown by another consideration. For reasons of state, the marriage relation is indissoluble by consent or by courts for causes not committed to their jurisdiction. This being the law of the relation, it must stand until it be repealed. A divorce act operates in each case as a repeal, so far, of the general law. This is a reason, and probably was the origin of the legislative interposition which turned individual cases into that forum. The provision as to contracts in the state and Federal constitutions does not prevent a severance of the marriage relation by consent or by the courts for cause, for this right attaches generally to all contracts. It is the law only which forbids the dissolution. The legislative assent being necessary, the Assembly becomes the power to declare the dissolution, and the presumption is, that it acts upon sufficient cause. Though legislative in form, its judg-

ment is presumptively rightful, because it is the body to which the exercise of the power has been delegated by the people, its members performing a public function under the sanction of an oath of office. There is also the respect due to it as a co-ordinate branch of the government, the maxim therefore applies—*Judicium semper pro veritate acceptum:* 2 Inst. 380.

In reference to the Federal provision we may add, that no authoritative decision of the Supreme Court of the United States having applied it to the contract of marriage, we must interpret it as we do the provision in the state constitution, as inapplicable to a divorce for cause. So far as indications of opinion have fallen from judges of the Federal Supreme Court, they have admitted the right of a state to enact divorce laws ; the only doubt expressed is of the power to dissolve a marriage without cause, and against the wish of the parties : Dartmouth College *v.* Woodward, 4 Wheat. 518 ; 2 Kent's Com. 107 ; 2 Story on the Const. 1397 ; 1 Kent's Com. 417, 8th ed. and notes. Different views have been held in some of the states, but perhaps the weight of such decisions is favorable to the legislative power. See Sedgwick on Statutory and Const. Law 635, &c., where the cases are collected. In view of the nature of the marriage contract, it is not probable the clause in the Federal Constitution will be held to prohibit special legislation for cause. The law for certain purposes regards marriage as initiated by a civil contract, yet it is but a ceremonial ushering in a fundamental institution of the state. The relation itself is founded in nature, and like other natural rights of persons, becomes a subject of regulation for the good of society. The social fabric is reared upon it, for without properly regulated marriage, the welfare, order and happiness of the state cannot be maintained. Where the greater interests of the state demand it, marriage may be prohibited ; for instance, within certain degrees of consanguinity, as deleterious to the offspring and to morals. For the same reason the law may dissolve it, and as a question of power, there is no difference whether this be done by a general or a special law.

The observations already made dispose of the question of notice. The power being shown to be legislative, the judicial quality of the act is merged. Notice becomes unnecessary, because it is a law and not a decree. Nothing then is left for inquiry but the justifying cause, and this brings us to the objection that no cause is set forth on the face of the act. It is supposed the absolute character of a law forbids inquiry into the grounds of legislation. But the answer is, that the grant of this power being limited in the constitution to certain grounds, an inquiry into them is a necessary duty under the bill of rights to prevent injustice. Under the 9th article of the constitution, which restrains the exercise of power over those things that it excepts out of the general powers

[Cronise v. Cronise.]

of government, and asserts shall for ever remain inviolate, the courts are declared to be open, and bound to administer legal redress for all injuries. If the boundary of a limited power be overstepped by the legislature, its act is void, and not only can be, but must be inquired into. The rightful presumption is, that every legislative act of divorce is founded in just cause, but it is not a conclusive presumption that this cause is outside of the jurisdiction of the courts. If because no ground is recited we refuse to inquire into the ground, we fail in an enjoined duty; the legislative will would become unbounded, and breaches of the constitution be beyond reach. In this respect we reaffirm the doctrine of Jones v. Jones, 2 Jones 350.

In view of the long-continued interpretation and usage under the constitution, and the amendment to it, we must conclude that a special divorce act is an exercise of legislative power, that primâ facie it is founded on sufficient cause not within the jurisdiction of the courts, and that this cause is inquirable into as a fact when not set forth in the act. The actual relations between husband and wife presented to the legislature as grounds of divorce, are the subjects of proof, as other facts are, and are readily distinguishable from the mere motives or reasons of the legislators who pass the law. In the case before us the grounds of the divorce are set forth in the petition of Mrs. Cronise, and ascertained in the proof read to the legislature. Two are alleged. The first, long-continued and artfully planned deceits practised upon her by her husband and others connected with him, to entrap her into a contract of marriage. It is thought this general statement brings the case within the jurisdiction of the court, under the Act of 1854, as an alleged marriage procured by fraud. But the deceits thus set forth are particularized and proved specially. They are the true grounds, and when examined are found not to fall within the meaning of the law. They consist of the design of Mr. Cronise, owing to his embarrassments, to relieve himself by a match for money; his selecting herself on account of her father's wealth; having himself introduced to her, and his virtues extolled by a mutual friend; paying to her devoted attention; exhibiting to her father false statements of his affairs; pretending to be in good circumstances, when really bankrupt; marrying her on the 29th of November 1860, and failing on the 22d of December, after having been guilty of dishonest practices which led to his arrest, and to proceedings to commit him to prison for his frauds—and, finally, his remaining with her under her father's roof until the 11th of February 1861, when he left secretly to avoid his creditors, though with her knowledge and assent.

These facts do not constitute the fraud meant by the Act of 1854. It is not pecuniary motives or delusive promises of wealth,

[Cronise *v.* Cronise.]

position and the like, which are the procuring fraud contemplated by that act. If they were, we have only to suppose the postponement of the husband's failure and the wife's discovery of the fraud, until after the birth of issue, to perceive the results to which such kind of fraud would lead. But the act contemplated no pecuniary or even moral fraud, arising from delusive hopes, or even the disappointment of just expectations. Its language is peculiar. It refers not to a marriage merely, but to an *alleged* marriage. It is this alleged marriage which must be procured by three similar causes in the effect produced, and all alike affect the act of marriage. The three procuring causes, to wit: fraud, force and coercion, are linked together in the same clause, equally qualify the same thing, to wit, an alleged marriage, and have a like operation as causes of dissolution. Force and coercion procure not a lawful marriage, but one only alleged, where the mental assent of the injured party is wanting. Fraud has a like effect; it procures not a marriage fully assented to by both of the parties and duly solemnized, but one where the unqualified assent of the injured party is wanting, and where the very act of marriage itself is tainted by the fraud. It is such a marriage alleged by one party, and not confirmed afterwards by the injured party, which the law places on the same footing as one procured by force or coercion. For example, a mock marriage ceremony performed without the intent of one party at least to marry, but fraudulently set up and alleged to be a real marriage, would be such an alleged marriage. So a swindling marriage ceremony fraudulently procured, to be performed by an impostor, personating a clergyman or a magistrate. There have been instances also, of very young persons cajoled by trick and artifice into a marriage where the full consent of the mind was really never given. In such cases, fraud, like force, touches the very act of marriage, and if not confirmed by the injured party, the alleged marriage may be inquired into, and set aside by the court. But to say that a failure of expectations, or a disappointment of hopes, though founded on false assurances of wealth or position, shall set aside a marriage fully assented to and duly solemnized as one merely alleged, and to declare it void on the proof of the arts of the courtship, would open a field of inquiry as limitless and difficult as it would be deceptive and injurious. A match for wealth may be not the less a match for love, where the preponderance of motive would be difficult to be weighed. Avarice may be baulked, but a lover is secured. The legislature never intended to encourage such inquiries, or to annul marriages for the same reasons that would set aside a stock operation or an exchange of horses.

In this case the marriage was fully assented to, and was never disputed or denied. The marriage itself was real and untouched

[Cronise v. Cronise.]

by fraud. However influenced by expectations on her part of wealth or position, or however business interests may have started him in pursuit, love had not less to do with it than money. There is no reason to doubt his love, and after reading her letters written to him long after his flight, it would do her injustice to deny her love, or to say that her marriage was a financial operation merely, in which she was overreached. But passing this, there was a second ground alleged, not in the jurisdiction of the courts. There is no pretence that Cronise was convicted of felony and sentenced two years or more to the prison or penitentiary, to constitute a ground of divorce, under the 2d section of the Act of 1854. But he had been guilty of frauds, which made him liable to prosecution and punishment. From these he fled, and was unable to return. It was not wilful desertion, a legal ground of divorce, but a flight from creditors. He left with her full assent, followed by her love, and without malice on his part. But in all its painful effects, it was desertion. To her moving entreaties for him to return, his offences opposed a barrier. She was in law a wife, yet in aught else a widow, bereft of a husband's presence and solace. Would she go to him, a desert on one hand, and two oceans on the other, intervened. To reach him would be to bear the ills of penury and to abandon home, comfort and kind parents. Are we to say that after waiting for his return until time had healed her wounded spirit and opened her eyes to his defects of character, that she must wait on ; or must we say that she shall continue bound to one from whose frauds and dishonesty she recoils, and from whom, her eyes being now opened, she shrinks ? Was all this no ground of relief ? Clearly it was legislative ground, not judicial. The special act was therefore valid, and the plaintiff's bill was properly dismissed.

The decree at Nisi Prius is affirmed with costs.