## Morgan v. Lere

Before Carson, P. J., Cummins, J., and Weiner, J.

*Howard F. Carson* and *August L. Sismondo,* for plaintiff.

*Austin J. Murphy, Jr.,* for defendant.

WEINER, J., November 13, 1959.*—This is an action for annulment of a marriage and comes before the

---

* The original opinion in this case was filed June 12, 1959. The above is an amended opinion.

court at this time on exceptions to the report of the master, recommending that a decree annulling the marriage be refused. The facts are not in dispute. Plaintiff, Carol Marie Morgan, was but 15 years of age when she was allegedly joined in marriage on May 6, 1958, to defendant, Robert Lere, who was then 18 years of age. It is admitted that plaintiff and defendant, accompanied by defendant's mother, Sarah Lere, made application for a marriage license on May 2, 1958, before the Clerk of the Orphans Court of Greene County, that on the said application Carol Marie Morgan gave her age as 19 and defendant gave his age as 21, that the said Sarah Lere falsely and wilfully represented to the said clerk that she was the mother of Carol Marie Morgan and fraudulently signed a consent to the said marriage by fraudulently signing the name of the minor's mother, Stella Marie Morgan. As a result of the false and fraudulent signing of the name of Stella Marie Morgan by the said Sarah Lere, a criminal charge was made against her in Greene County, and sentence was later passed by the Court of Greene County on her plea of nolo contendere.

As a result of the said fraudulent application, a marriage license was issued on May 5, 1958, and the alleged marriage ceremony was performed on May 6, 1958, at McKeesport. Apparently the parties lived together until May 12, 1958, when plaintiff left defendant and returned to the home of her parents where she has since resided. This complaint in annulment was filed in her behalf by her father and next friend, Albert T. Morgan, on May 26, 1958. A hearing was later held before the master and the aforesaid facts developed. Following that hearing the master filed his report on March 11, 1959, recommending that the prayer of the complaint in annulment be refused. To that report and recommendation plaintiff filed ex-

ceptions, raising the question of law as to whether annulment lies under the particular circumstances of this case, under the laws of Pennsylvania applicable thereto.

It has long been the rule in Pennsylvaina that since marriage and the family unit constitute the fundamental relationship upon which our society is founded, the Commonwealth, by reason of its vital interest in that relationship, has more and more made marriage a subject of regulation. Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effect upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

As early as 1867 we find the following quotation in the case of Cronise v. Cronise, 54 Pa. 255, at page 262: "The law for certain purposes regards marriage as initiated by a civil contract, yet it is but a ceremonial ushering in of a fundamental institution of the state. The relation itself is founded in nature, and like other natural rights of persons, becomes a subject of regulation for the good of society. The social fabric is reared upon it, for without properly regulated marriage, the welfare, order and happiness of the state cannot be maintained."

The increasing divorce rate and the apparent weakening of the marriage relationship, as reflected in the increased problems and duties of our domestic relation courts, has pointed up the social aspects of marriage. It has been so impressed upon us, that law-making bodies everywhere have seen fit to impose safeguards against ill-advised unions. Thus, waiting periods,

medical examinations, age restrictions, marriages within certain degrees of consanguinity and affinity and many other controls have been universally imposed by State legislatures in order to preserve and maintain the utmost purity and integrity of the marriage state, and thus to increase its stability.

It is true that at common law a boy under 14 or a girl under 12 could not be married: 1 Blackstone, Commentaries on the Laws of England, Chap. 15, page 402. And until there was a statute fixing the age at which persons were capable of entering into the marriage relation, the common law ages of consent were recognized. By reason of that common law rule, our former decisions uniformly held that where minors entered into a marriage, even without the consent of the parents or guardian or contrary to the provisions of marriage license statutes, the same was deemed valid so long as the marriage was contracted by minors of the age of consent, under the common law rule aforesaid.

The legislature in 1953, apparently recognizing the evils inherent in such a rule, enacted The Marriage Law of August 22, 1953, P. L. 1344, 48 PS §1.1, making it mandatory that a minor under the age of 16 secure the consent to said marriage from a judge of the orphans court. It is our considered opinion that this provision is mandatory, and that any marriage entered into without strict compliance therewith, is a nullity. This requirement represents no invasion of the rights of citizens. It is a declaration of public policy fulfilling a two-fold function, to wit, protecting marriage as an estate and placing a restraining hand upon the shoulder of impetuous youth. Its enactment was due to the interest of society in marriage as well as its interest in promoting the best interests of our minors at the same time.

As Judge Laub so well expressed it in the case of

In re Barbara Haven, 86 D. & C. 141, 143: "Love has many emotional counterfeits, each as likely as the other, but time and mature appreciation are the only devices known which detect the real from the spurious. The emotional mechanism of youth, like a sensitive weathercock, points with equal fidelity to the temporary and illusive as to the constant and substantial.

"All of this was within the knowledge and contemplation of the legislature when it enacted the present law."

In holding the marriage age of consent to 16, the legislature recognized that there is more to marriage than physical and mental development, that mature understanding and judgment and emotional stability are involved therein, that there must be a deep and abiding concept of marriage as more spiritual than physical, more an estate and status than a mere condition. In its wisdom, the legislature recognized by this act of 1953 that an appreciation of these elements is generally absent in minors of the age of this plaintiff.

This revolutionary change in our public policy with respect to the marriage of minors was approved by our Superior Court in the case of Lannamann v. Lannamann, 171 Pa. Superior Ct. 147, where they clearly recognize that under this act of 1953, the age of consent is now 16.

While this court is basing its conclusion upon the mandatory provisions of The Marriage Law of 1953, supra, making this marriage in question a nullity, the court would be remiss in its duty if it did not refer to the criminal conduct of the parties heretofore mentioned, that brought about the alleged marriage ceremony in this case. The action of the party or parties concerned with respect thereto, must be viewed with opprobrium. The courts should never recognize a marriage which is contrary to good morals or to positive and declared public policy. We are therefore compelled to sustain the exceptions of plaintiff in this proceeding

and affirm the decree of annulment filed under date of June 12, 1959.