# Barnes v. Barnes

*Thomas J. Evans,* for plaintiff.

*J. Arnold Grisman,* for defendant.

KREISHER, P. J., August 4, 1961.—This matter comes before the court on plaintiff's exceptions to the report of the master recommending plaintiff be denied a divorce on the grounds of indignities to person because she failed to show compliance with section 16 of the Act of May 2, 1929, P. L. 1237, as amended, 23 PS §16 which provides, inter alia:

"No spouse shall be entitled to commence proceedings for divorce by virtue of this act who shall not have been a bona fide resident in this Commonwealth at least one whole year immediately previous to the filing of his or her petition . . ."

From the testimony taken before the master, the following facts were developed. On the night of May 27, 1960, plaintiff, then 15 years of age and living with her parents in this county, eloped with defendant, then 27 years of age, twice divorced with a criminal record.

Defendant had an old car but very little money, so plaintiff removed approximately $400 from her parents' home. They drove to Maryland where they were able to cash some of the bonds, after which they continued south to Chesterfield, S. C., where on May 30, they were married after giving false ages to secure a license. They then continued to Chester, S. C., where defendant opened a paint shop of sorts and moved his wife into a room upstairs.

Plaintiff's parents reported her missing to the police. However, the search failed to reveal her whereabouts. In due time, plaintiff's bonds were exhausted, so that she was left alone in her room without lights, water or food while defendant made his rounds of the taprooms and so forth.

Plaintiff's dire circumstances became the concern of a waitress in the restaurant across the street, who, on September 1, wrote plaintiff's parents to come and get her before something drastic happened.

Upon receipt of this letter, an information was lodged before a justice of the peace in this county charging defendant with the crime of contributing to the delinquency of a minor. He was then brought back to Pennsylvania after waiving extradition, and, in due time, on advice of counsel he pleaded guilty in open court and was sentenced to the county jail for a term of not less than one, nor more than three years.

Plaintiff's parents brought her back to their home and she resumed her schooling in the public schools. No children resulted from this marriage, and plaintiff now seeks a divorce.

Plaintiff instituted annulment proceedings shortly after her return but this action was discontinued, for reasons not brought to the court's attention, on December 12, and said divorce proceedings were instituted on December 13, 1960.

The master's hearing was held January 9, 1961, and the master filed his report January 23. Plaintiff's exceptions were filed January 30, but the matter was never ruled for argument.

Counsel for plaintiff agrees that the court might dispose of the case without the benefit of argument or written brief, so the matter is now before us for disposition.

Our independent research has failed to reveal any case precisely in point. However, we do find a recent similar case where an annulment was granted in the case of Morgan v. Lere, 20 D. & C. 2d 441. Beginning on page 443 of the opinion, the court states:

"It has long been the rule in Pennsylvania that since marriage and the family unit constitute the fundamental relationship upon which our society is founded, the Commonwealth, by reason of its vital interest in that relationship, has more and more made marriage a subject of regulation. Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effect upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution.

"As early as 1867 we find the following quotation in the case of Cronise vs. Cronise, 54 Pa. 255, at page 262: 'The law for certain purposes regards marriage as initiated by a civil contract, yet it is but a ceremonial ushering in of a fundamental institution of the state. The relation itself is founded in nature, and like other natural rights of persons, becomes a subject of regulation for the good of society. The social fabric is reared

upon it, for without properly regulated marriage, the welfare, order and happiness of the state cannot be maintained.'

"The increasing divorce rate and the apparent weakening of the marriage relationship, as reflected in the increased problems and duties of our domestic relation courts, has pointed up the social aspects of marriage. It has been so impressed upon us, that law-making bodies everywhere have seen fit to impose safeguards against ill-advised unions. Thus, waiting periods, medical examinations, age restrictions, marriages within certain degrees of consanguinity and affinity and many other controls have been universally imposed by State legislatures in order to preserve and maintain the utmost purity and integrity of the marriage state, and thus to increase its stability.

"It is true that at common law a boy under 14 or a girl under 12 could not be married: 1 Blackstone, Commentaries on the Laws of England, Chap. 15, page 402. And until there was a statute fixing the age at which persons were capable of entering into the marriage relation, the common law ages of consent were recognized. By reason of that common law rule, our former decisions uniformly held that where minors entered into a marriage, even without the consent of the parents or guardian or contrary to the provisions of marriage license statutes, the same was deemed valid so long as the marriage was contracted by minors of the age of consent, under the common law rule aforesaid.

"The legislature in 1953, apparently recognizing the evils inherent in such a rule, enacted The Marriage Law of August 22, 1953, P. L. 1344, 48 PS §1.1, making it mandatory that a minor under the age of 16 secure the consent to said marriage from a judge of the orphans court. It is our considered opinion that this provision is mandatory, and that any marriage entered into without strict compliance therewith, is a nullity.

This requirement represents no invasion of the rights of citizens. It is a declaration of public policy fulfilling a two-fold function, to wit, protecting marriage as an estate and placing a restraining hand upon the shoulder of impetuous youth. Its enactment was due to the interest of society in marriage as well as its interest in promoting the best interests of our minors at the same time.

"As Judge Laub so well expressed it in the case of In re Barbara Haven, 86 D. & C. 141, 143: 'Love has many emotional counterfeits, each as likely as the other, but time and mature appreciation are the only devices known which detect the real from the spurious. The emotional mechanism of youth, like a sensitive weathercock, points with equal fidelity to the temporary and illusive as to the constant and substantial.

" 'All of this was within the knowledge and contemplation of the legislature when it enacted the present law.'

"In holding the marriage age of consent to 16, the legislature recognized that there is more to marriage than physical and mental development, that mature understanding and judgment and emotional stability are involved therein, that there must be a deep and abiding concept of marriage as more spiritual than physical, more an estate and status than a mere condition. In its wisdom, the legislature recognized by this act of 1953 that an appreciation of these elements is generally absent in minors of the age of this plaintiff.

"This revolutionary change in our public policy with respect to the marriage of minors was approved by our Superior Court in the case of Lannamann v. Lannamann, 171 Pa. Superior Ct. 147, where they clearly recognize that under this act of 1953, the age of consent is now 16.

"While this court is basing its conclusion upon the mandatory provisions of The Marriage Law of 1953,

supra, making this marriage in question a nullity, the court would be remiss in its duty if it did not refer to the criminal conduct of the parties heretofore mentioned, that brought about the alleged marriage ceremony in this case. The action of the party or parties concerned with respect thereto, must be viewed with opprobrium. The courts should never recognize a marriage which is contrary to good morals or to positive and declared public policy. We are therefore compelled to sustain the exceptions of plaintiff in this proceeding and affirm the decree of annulment. . . ."

We do not contend the foregoing is binding precedent for the case under discussion, but we do think the public policy therein mentioned applies, and that the State is always an interested third party in every divorce case. The public policy involved in this case was discussed at length in an opinion filed by this court some months ago on defendant's petition for writ of habeas corpus after being sentenced on the criminal charge, and our feelings in this regard have not been altered.

Now, taking up the important jurisdictional question, we start with the general and well-recognized rule that "the domicile of a legitimate, unemancipated minor is, if his father be alive, the domicile of the latter": Estate of John Cannon, 10 Montg. 179.

In the Law of Marriage and Divorce in Pennsylvania, by Freedman, vol. 1, §118, beginning on page 287, it is stated:

"No person can, at the same time, have more than one domicil. 'The domicil of origin is the domicil assigned to every child at its birth.' 'Every person has at all times one domicil, and no person has more than one domicil at a time.' Domicil may be that of origin, or of choice. A domicil once acquired is presumed to continue despite physical absence, and is not lost until a new domicil is established. Only when a new intention arises

to establish a domicil elsewhere does the first element of change of domicil appear. This element alone is insufficient to effect the legal change. There must exist with it the physical presence at the new domicil before it may be legally acquired . . .

"A change in domicil must be made voluntarily by a person who has the legal capacity to do so . . .

"A domicil, once acquired, is not lost by mere absence or change of residence. It is only when the intention to return to the domicil is gone, and it is therefore in mind as well as in fact abandoned and a new domicil has been established in law, that the former domicil disappears from the horizon of the law. Domicil is to be determined by the intention of the party, conjoined with actual residence; but this intention may be shown more satisfactorily by acts than by declarations."

The important sentence in the foregoing quotation that "a change in domicil must be made voluntarily by a person who has the legal capacity to do so," is based upon section 15, subsec. (1) of the Restatement of Conflict of Laws which provides that:

"(1) A domicil of choice is a domicil acquired, through the exercise of his own will, by a person who is legally capable of changing his domicil."

For the purposes of this case, the pertinent inquiry is the determination of whether or not a minor under the age of 16 is legally capable of changing her domicil. We conclude under the facts of this case that plaintiff lacked the legal capacity without her father's consent to change her domicil, and, therefore, her domicil remained the domicil of her father.

Our Superior Court in the case of Lannamann v. Lannamann, 171 Pa. Superior Ct. 147, recently held that, under the Marriage Law of August 22, 1953, P. L. 1344, 48 PS §1-1, the age of consent in Pennsylvania is now 16.

Beginning on page 150 of the opinion, the court stated:

"In any event, where parties under age are married, the only question is whether they are of the age of consent, i. e. sixteen."

By analogy, it would seem to follow that a child under the age of 16 does not have the legal capacity to change the domicil of her origin, and, therefore, even though she had a sojourn to the south for a few months, her legal residence and domicil for the purpose of instituting a suit for divorce is that of her father in this county, which was not lost.

In the case of Corp v. Corp, 61 Pitts. L. J. 143, it was held, on exceptions to the report of the master in divorce, that:

"Residence for the purpose of instituting a suit for divorce is not lost by the libellant who goes with her husband to another city where he intended to take a permanent residence if he secured permanent employment, but did not because of uncertain employment, and after three months absence returned to the place of his residence in this state." (syllabus)

In addition to the foregoing, the Pennsylvania legislature in 1935 broadened the annulment statute to cover not only bigamous marriages, but all types of marriages null and void ab initio, and, in fixing the jurisdictional requirement for annulment, it is very aptly set forth in the act, 23 PS §15, that:

"Petitions or libels for the annulment of void or voidable marriages may be exhibited to the court of common pleas of the county where the marriage was contracted, or in the county where either the libellant or respondent resides, and, in such cases, residence of the libellant within the county or State, for any period shall not be required."

This provision would seem to indicate that the legislature had in mind relief for the grave consequences

which flow from an illegal child marriage where a man takes an infant into another State and marries her, and after which the parents of the infant return the child to the State of her origin.

In addition to this analogy, we find that the courts of common pleas before the broadening of the Annulment Act in 1935 entertained bills in equity to declare marriages of this nature void, such as those mentioned in the case of Shaffer v. Harris, 71 D. & C. 587, wherein the court stated:

"Two authorities are cited by plaintiffs as precedents for this unusual suit. In Hullahan et al. vs. Paritz, 75 P. L. J. 128, defendant induced a girl 17 years of age to misrepresent her age as 21. The marriage was never consummated. The proceeding was in equity and a decree was granted. In Penxa et al. vs. Tanno, 15 D. & C. 79, a 13-year-old girl brought a bill in equity by her mother to secure annulment of her marriage with a Japanese 28 years old. She had obtained a license by falsely swearing she was 21 years old. The marriage was annulled.

"Of the Hullhan and Penxa cases the Messers. Freedman in their excellent work on Marriage and Divorce in Pennsylvania, vol. 1, page 31, have this to say: 'These decisions, however, are unsupportable either on principle or on authority'."

In at least one case, the declaratory judgment law was used to grant relief: Travis v. Travis, 19 D. & C. 505.

These decisions, however, are criticized in the Law of Marriage and Divorce, by Freedman, as being unsupportable either on principle or on authority. However, the author does note that the broadening of the Annulment of Marriage Act in 1935 (Act of July 15, 1935, P. L. 1013) closed this gap in the law, and that said marriages since said act could be legally terminated.

In the present case, an annulment proceedings was originally instituted, and we have no knowledge of why the same was discontinued, since we understand there is no question in this case about bastardizing a child which can possibly result in annulment proceedings, and we are satisfied that the law provides very definitely for annulment of a marriage of this type, and from the above-quoted section of the annulment law, we would not be confronted with the jurisdictional question if this were an annulment proceedings.

The Divorce Law of May 2, 1929, as amended, does not in express terms require domicil on the part of plaintiff. The act provides that plaintiff must be ". . . a bona fide resident in this Commonwealth at least one whole year immediately previous to the filing of his or her petition or libel": 23 PS §16.

It has been consistently held that this statutory provision requires domicil as well as one-year residence within the State for the domiciliary period and bona fide residence has been defined to mean residence with domiciliary intent.

Since we conclude that a child of 15 does not have the capacity to change the domicil of her origin, and we find that domicil may continue within the State notwithstanding absence from the State, we are inclined to apply the rule, which is well-settled, that mere temporary absence does not impair what would otherwise be a bona fide residence, and therefore, it follows that, in our opinion, this court has jurisdiction of the above-captioned divorce proceedings, and this conclusion is bolstered by the aforementioned public policy which is involved in this proceeding.

Taking up the alleged grounds of indignities to the person which occurred following the marriage and outside of the jurisdiction of Pennsylvania, it is held that the court of Pennsylvania may grant a divorce on grounds which occurred in another jurisdiction.

The manner in which defendant conducted himself and his conduct toward plaintiff during the months of July and August in South Carolina indicates that his taking plaintiff away from her home in the first instance was pure adventure, and that the novelty of it wore off in less than one month. He then began to neglect plaintiff, failed to support her properly, stayed out late at night leaving plaintiff at home alone without lights, food, or money, and this disinterest which developed was no doubt occasioned in the court's opinion by the fact that plaintiff had by that time expended the $400 she actually took from her mother without authority. This course of conduct further indicates that the court has jurisdiction of this case, and that plaintiff never lost her residence in Pennsylvania.

This question is very ably and at length discussed by Judge Sohn in the case of Williams v. Williams, 88 D. & C. 445, wherein it was held that a wife plaintiff in a divorce action, who was a lifelong resident of Pennsylvania and married defendant, a resident of Florida, and both lived together only in California for a short period of time, was not held to have acquired her husband's residence in Florida, but remained a resident of Pennsylvania within the meaning of the Divorce Law.

The court quoted with approval the case of Dickson v. Dickson, 78 D. & C. 189, wherein Judge Nixon, of Allegheny County, held that a wife's residence in Pennsylvania did not shift to an uncertain dwelling place of the husband who failed and neglected to establish a dwelling place with domiciliary intent as a home. The conduct, the actions, and the manner in which the husband treated his wife and attempted to establish a home was indicative of the fact that there was no bona fide residence acquired at the new abode.

In the present case, both plaintiff and defendant were lifelong residents of the State of Pennsylvania, and the testimony, which not only indicates defendant's

attitude of settled neglect and hate toward his wife during the last two months of their marriage together, also indicates there was no permanency in the minds or the conduct of the parties to make South Carolina their permanent dwelling place.

The closing paragraph of the opinion in the Williams case reads as follows:

"She was never physically present in the State of her husband's residence. He associated with another woman, and her child. . . . These facts indicate that defendant had no intention of establishing a home for his wife in Florida. We conclude that plaintiff, in this case, was under our divorce statute, a resident of Pennsylvania, and our court has jurisdiction."

Therefore, without further comment, we enter the following:

*Order*

And now, to wit, August 4, 1961, it is ordered, adjudged and decreed that a decree be entered divorcing Darla Fox Barnes, plaintiff, from Lee Allen Barnes, defendant, and from the bond of matrimony contracted with him with the same effect as if they had never been married, or as if defendant, Lee Allen Barnes, were dead.