## Bonsavage v. Bonsavage.

*Husband and wife—Divorce—Illegitimate child—Fraud—Act of May 8, 1854.*

1. The existence of an illegitimate child of a woman who fails to tell her intended husband of it will not avoid the marriage and does not constitute such fraud as will entitle him to a divorce under the Act of May 8, 1854, P. L. 644.

2. This is especially true where evidence of several witnesses is to the effect that the husband, at the time of the marriage, knew the child, had been with it frequently at the home of the mother and knew about its parentage.

Libel in divorce. C. P. Luzerne Co., May T., 1926, No. 1126.

*M. F. McDonald,* for libellant; *Paul J. Schmidt,* for respondent.

COUGHLIN, J., March, 1927.—This is an action in divorce in which subpœna issued April 22, 1926, on libel filed the same date, and subpœna served personally upon respondent April 29, 1926.

Testimony was taken before the court, both libellant and respondent being present with their witnesses and counsel, and the matter now under our consideration is whether or not the libellant upon the testimony is entitled to a decree in divorce.

The grounds alleged upon which divorce is sought are that the marriage between libellant and respondent was procured by fraud, force and coercion, not subsequently confirmed by the acts of the libellant, and more particularly that the respondent concealed from the libellant the fact that she was the mother of a living illegitimate child, born about two years before the marriage between libellant and respondent, which took place Oct. 29, 1924.

Respondent denies any fraud, force or coercion, and avers that, before the marriage ceremony, she informed the libellant as to the child, and that he knew all the facts and details, having full knowledge of and acquaintance with the child.

Both libellant and respondent have lived all their lives in Luzerne County, the respondent residing in Plymouth, the libellant in the adjoining Borough of Larksville. Both attended the same church; the families of both were active therein; they lived within two miles of each other. Intimate acquaintance between libellant and respondent covered a period of five or six weeks, during which they went automobile riding together, went to the theatre and associated evenings at her home.

The parties hereto were married Oct. 29, 1924, in Hazleton, Luzerne County, Pennsylvania, by Rev. S. J. Struckus, a priest, at one time in charge of the church they both attended in the vicinity in which they lived, acquainted with both families and intimately acquainted with both the libellant and respondent.

The marriage, by agreement between the parties thereto, was to be kept a secret, libellant and respondent each returning to their respective homes after the marriage. Following the marriage, libellant called upon respondent evenings at her home. About ten days following the marriage, announcement thereof appeared in the press.

. The testimony is conflicting as to two major facts: First, whether or not libellant and respondent consummated the marriage following the marriage ceremony; second, whether or not the libellant knew of the existence of respondent's two-year-old child before marriage.

The Act of May 8, 1854, par. 1, P. L. 644, provides that it shall be lawful for the Court of Common Pleas to grant divorce where an alleged marriage was procured by fraud, force or coercion and has not been subsequently confirmed by the acts of the injured party.

There is nothing in the evidence indicating any force or coercion. In order to vitiate the marriage contract on the ground of force or coercion, the same must overpower the judgment, coerce the will. There must be such a mental condition that the libellant did not and could not in reality consent to the marriage: Todd v. Todd, 149 Pa. 62.

"The fraud sufficient to grant a decree of divorce upon must be in what has been sometimes termed the *essentialia* of the contract. . . . It will be found difficult, after a study of the authorities, to lay down any rule which will sharply define and distinguish what are and what are not essentials. Every case must, in a great extent, stand on its own circumstances:" Sturgeon, Pennsylvania Law and Procedure in Divorce (2nd ed.), 73.

The prior unchastity of a woman concealed from her husband does not constitute such a fraud on him as to avoid the marriage: Allan's Appeal, 99 Pa. 196. The same rule is declared in the English case: 18 L. R. A., note, page 377.

Bishop, in his Marriage and Divorce, § 179, cited in 99 Pa. 200, considers that by well established principles if the woman has even been a common prostitute, and yet reformed her life, yet conceals her former misconduct, the marriage would still be good. The marriage contract is an express renunciation by her of all unlawful intercourse with others than her husband, and he makes a similar renunciation. According to the marriage services, . . . they both solemnly promised, forsaking all others, to keep themselves solely to each other. . . . This marriage service is good evidence of the ancient common law of England. This seems to be also the dictate of humanity and in conformity to the gospel, which so strongly throughout inculcates the rule of forgiveness.

Actual pregnancy at the time of the marriage presents an entirely different question. It introduces a different element. The marriage status of the

Bonsavage *v.* Bonsavage.

parties is changed: Allan's Appeal, 99 Pa. 201. Also, 18 L. R. A., note, page 377, wherein it is held that antenuptial pregnancy by third person makes a woman physically incapacitated for marriage.

Cases which have been supposed to favor divorces for antenuptial misbehavior are cases where there was actual pregnancy at the time of the marriage. These have a direct tendency to confuse inheritance and create disputes of legitimacy.

If the mere fact that a woman has committed fornication before marriage and fails to tell her intended husband of it does not constitute such a fraud upon him in procuring the marriage as to entitle him to a divorce under the Act of May 8, 1854, the existence of an illegitimate child ought not to constitute such a fraud.

It was held that the fact that a woman at the time of marriage was the mother of an illegitimate child, and that she falsely alleged that she was a widow and that the child was that of a former husband, is not ground for divorce: Farr *v.* Farr, 2 McArthur, 35.

The concealment by a woman of the fact that she had been a mother of an illegitimate child some years before was held not to be ground for annulling the marriage: Smith *v.* Smith, 8 Or. 100, cited in 18 L. R. A. 377.

In the instant case we find as a fact that the libellant knew of the illegitimate child of the respondent. The respondent so testifies, corroborated by respondent's two sisters and mother. One of the witnesses of the marriage testified that he asked the libellant whether he knew the respondent had a baby, to which libellant responded, "Yes." The libellant admits the conversation, but avers the witness asked if he knew the girl he was marrying, and he answered, "Yes."

The child resided in the home of respondent with respondent's two grownup sisters and respondent's mother. Respondent testified that the child was present when libellant called at the home; enlarged pictures of the child hung upon the wall; discussions were held concerning the child; and the libellant played with the youngster and gave it money, as well as taking it riding in the automobile with the respondent. A neighbor, a disinterested witness, testifies that she saw the child accompany the libellant and respondent in the automobile. The priest, the former pastor of both libellant and respondent, testified that he was sure that libellant knew about the baby, having asked him at the time the marriage ceremony was performed, "George, do you know you are of age?" answered in the affirmative; "George, do you know what you are doing?" also answered in the affirmative; and, further, "Now, do you feel that everything will be all right, knowing Anna's case?" likewise answered in the affirmative. On cross-examination, the priest testified that "Anna's case" was well known in the community in which both of the parties lived, having actually been in court. Against all of this there is but the testimony of the libellant. We can come to but one conclusion, and that is that the child's existence as the illegitimate child of respondent was known to libellant before the marriage, and became the subject of objection following the marriage, due to the attitude of libellant's family, as averred by respondent.

Finding this fact, as we do, eliminates the question of fraud by the failure of the respondent to disclose the fact if she was called upon to so disclose it.

In reaching this conclusion, we are further assisted by the improbability of much of the testimony of the libellant, who complains that the wife advanced the funds necessary to meet the expenses of marriage, and that he acted "as if he was doped, just like sick." He was, nevertheless, able to work the morn-

ing of the day he was married and the succeeding days, and visited his wife at her residence. Her explanation that she furnished the funds because he was using his money in connection with a new house being erected by his family, in which he was assisting and which house he admits he showed to his wife before they were married, is more capable of belief than his testimony. He gives no explanation except that she wanted to get married, while he did not, when all his actions indicated that his desires in the matter were equal with hers.

The law makes no provision for relief for one who, having solemnly entered into the marriage contract, seeks to avoid it on testimony such as libellant has herein produced.

Therefore, divorce is refused and libel dismissed.

From Frank P. Slattery, Wilkes-Barre, Pa.