## Keeney v. Keeney

*Albert G. Brown* and *William J. Graham*, for exceptant.

*George F. Taylor* and *Taylor, McNaugher & Duerring*, contra.

JOHN K. TABOR, Master in divorce.—This proceeding involves cross actions in divorce. At no. 3462 July term, 1960B, Dorothy Keeney (Dorothy) sues Charles Keeney (Charles) for divorce from bed and board charging cruel and barbarous treatment, indignities to

the person and malicious abandonment. At no. 881 January term, 1961A, Charles sues Dorothy for divorce from the bonds of matrimony on the ground that the marriage was procured by fraud in that, at the time of the marriage, Dorothy, contrary to her representations, intended not to perform any of the essential marital duties and obligations . . .

The master recommends that, at no. 3462, judgment be entered dismissing Dorothy's complaint, and that, at no. 881, a decree of divorce from the bonds of marriage be entered in favor of Charles and against Dorothy.

The Act of May 2, 1929, P. L. 1237, sec. 10, as amended 23 PS §10, provides in part:

"1. When a marriage has been heretofore or shall hereafter be contracted and celebrated between two persons, it shall be lawful for the innocent and injured spouse to obtain a divorce from the bond of matrimony, whenever it shall be judged, in the manner hereinafter provided, that the other spouse: . . .

"(g) Shall have procured the marriage by fraud, force, or coercion, and which has not been subsequently confirmed by the acts of the injured and innocent spouse; . . ."

Under the statute, divorce from the bonds of marriage will thus be decreed where one of the parties has practiced a fraud upon the other, the other has relied upon the fraud, the other is injured and innocent, and the other has not, subsequent to discovering the fraud, confirmed the marriage: 12 P. L. Encyc. 229-231, Divorce §24.

What, then, is "fraud" within the meaning of the statute?

At common law, and under early Pennsylvania law, fraud was construed to mean that which procured a marriage not fully assented to by both of the parties, a marriage:

". . . where the unqualified assent of the injured party is wanting, and where the very act of marriage itself is tainted by the fraud. It is such a marriage alleged by one party, and not confirmed afterwards by the injured party, which the law places on the same footing as one procured by force or coercion. For example, a mock marriage ceremony performed without the intent of one party at least to marry, but fraudulently set up and alleged to be a real marriage, would be such an alleged marriage. So a swindling marriage ceremony fraudulently procured, to be performed by an impostor, personating a clergyman or a magistrate. There have been instances also, of very young persons cajoled by trick and artifice into a marriage where the full consent of the mind was really never given. In such cases, fraud, like force, touches the very act of marriage, and if not confirmed by the injured party, the alleged marriage may be inquired into, and set aside by the court . . .": Cronise v. Cronise, 54 Pa. 255, 264 (1887).

Cronise almost seemed to be saying that if there was a valid or mutually intended marriage ceremony, the doctrine of fraud did not apply.

This rule was modified by Allen's Appeal, 99 Pa. 196 (1881). There plaintiff and defendant went through a marriage ceremony, each intending to be married to the other. The husband contended that he later learned that his wife had been pregnant prior to the marriage. He denied having had intercourse with her prior to the marriage. He sought divorce on the ground of fraud, claiming that the wife's concealment of her pregnant condition at the time of marriage was a fraud upon him that so changed the marriage status of the parties that it vitiated the marriage.

The matter was submitted to the jury which found the husband's allegations true. A divorce was granted. On appeal the verdict and decree of divorce were

affirmed. The court modified the earlier harsh rule and laid down the modern Pennsylvania rule as follows: (p. 199-200)

"By the first section of the Act of May 8th 1854, Pamph. L. 644,[1] it is provided that "it shall be lawful for the courts of common pleas of this Commonwealth to grant divorce where the alleged marriage was procured by fraud, force or coercion.' By this language must of course be understood such fraud as would at common law render a marriage void. It is settled beyond all controversy, that fraud which would vitiate any other contract—even an executory contract to marry—will not have that effect when the marriage has actually been solemnized and consummated. 'It is well understood,' says Chancellor Kent, 'that error and even disingenuous representation, in respect to the qualities of one of the contracting parties in his condition, rank, fortune, manners and character, would be insufficient. The law makes no provision for the relief of a blind credulity . . . however it may have been produced:' 2 Kent's Comm. 77."

The court did not expressly overrule Cronise v. Cronise, but the holding appears contrary to the rule pronounced in that case for in Allen's Appeal there was no false personation and both parties intended to marry at the time of the ceremony; nevertheless, divorce on the ground of fraud was allowed on the ground that there had been concealment of an "essential" of the relationship. The court said (p. 200):

"The fraud must be in what has been sometimes termed the *essentialia* of the contract. False personation by one of another person would undoubtedly be such a case. As to any other it will be found difficult,

---

[1] The Act of 1854 is the predecessor to the present act. The present act adds the requirement that the marriage "has not been subsequently confirmed by the acts of the injured and innocent spouse." (See page 539, supra.)

after looking through all the authorities, to lay down any rule which can sharply define and distinguish what are and what are not essentials. Every case must, to some extent, depend on its own circumstances."

The rule of Allen's Appeal was applied and followed by the late Judge Adams in Silveroli v. Silveroli, 98 Pitts. L. J. 181 (1949). There plaintiff, the husband, was a Pittsburgh resident who had served in the Armed Forces in World War II. Defendant was an Italian national who entered the United States under the special provisions allowing an intended spouse of a former serviceman to enter the United States, although not otherwise qualified under the immigration laws. Pursuant to arrangements by defendant's sister, defendant entered the United States, married plaintiff husband, but thereafter failed to cohabit with him or otherwise to perform her marital duties.

Plaintiff husband filed an action for divorce on the ground of fraud. Judge Adams granted a divorce. He first summarized the law, saying (p. 182) :

"Fraud, to invalidate a marriage, must be in the 'essentialia of the contract' (Allen's Appeal, 99 Pa. 196). The representation must relate to some matter which 'concerns the marital relation itself.' (Ayers v. Ayers, 64 P. L. J. 724; A. B. v. C. B., 50 D. & C. 454.) The falsehood must go to 'the very fundamentals or essentials of the marriage' (55 C. J. S., Sec. 34, b, (3), (a) ). 'A marriage without any intention of carrying out the marital duties and obligations is a fraud on the other party going to the essence of the contract.' (55 C. J. S. Marriage, Sec. 34, b, (3, (b) )."

In language applicable to the present case, Judge Adams then said (p. 183) :

"The evidence brings the firm conclusion that defendant's pre-marital declaration that she intended to become plaintiff's wife was false; that the representation, embraced in the marriage ceremony—that she

intended to perform the marital duties and obligations —was false; that plaintiff relied on these representations; that plaintiff would not have married defendant if he had known the true character of her intention; that defendant's conduct was designed to deceive plaintiff; that defendant procured her marriage with plaintiff by fraud; that defendant's motive was the desire to enter the United States and secure the right to remain here permanently."

Again in Masciocchi v. Masciocchi, 72 D. & C. 257 (1950), plaintiff wife was led to marry defendant husbend by his promise that if she eloped and went through a marriage ceremony before a justice of the peace, he would later marry her in church. The couple were married before a justice of the peace but the marriage was never consummated. In fact, the husband never intended to marry in a church ceremony nor to cohabit with his wife, but had led the wife into the official ceremony only to spite the wife. The divorce was granted.

Again, the apparent narrow rule of the Cronise case was disregarded: Masciocchi involved a complete and valid marriage ceremony, but a divorce was nevertheless granted because at the time of the ceremony, one party had the intention not to perform the marital obligations after the valid ceremony.

Admittedly the facts in the Masciocchi case are stronger than the case at bar. On the other hand, we consider the Silveroli case strongly analogous. In Silveroli the deception was for the purpose of gaining entry and permanent residence in the United States. In the case at bar, it is charged that the deception was to procure a divorce with alimony.

In addition to the above Pennsylvania decisions the treatise writers, stating the law generally, but not necessarily as applied in Pennsylvania, state:

"Marriage involves a promise to perform the marital duties and obligations, and where a marriage is con-

tracted without any intention of performing those duties, and in fact they are not performed, the fraud is such as to go to the essence of the contract. Thus a marriage may be annulled as against one who at the time of the marriage did not intend to perform the marital duties, but, on the contrary, assumed the relation with the sole intention of fraudulently obtaining the other's property or some advantage which inheres in the matrimonial state, unless the other spouse knew the facts. . .": 55 C. J. S. 869, (Marriage §34 b(3) (b) (1948) ).

" 'Fraud' as used in such statutes must be understood to mean such fraud as would at common law render a marriage voidable. Thus, where fraud is a ground of divorce under the statutes, if a man contracts the marriage relation without the intention of continuing it and immediately abandons the woman, a valid ground for divorce exists at the instance of the wife. . .": 17 Am. Jur. 351-2 (Divorce and Separation, §143 (1957) ).

"On the other hand, for the reason that marriage is a civil contract requiring the utmost good faith on the part of those most intimately concerned, it has been held in several cases that if a man contracts the marriage relation without the intention of continuing it, and immediately abandons the woman, a valid ground for divorce or annulment exists at the instance of the wife. . . A man is entitled to annulment of the marriage *where the woman goes through the ceremony merely to secure his name, with no intention of living with him, and leaves him immediately at its conclusion.* But it has been held in an action for annulment on the ground of fraud that such annulment will not be granted upon evidence of denial of intercourse *unless at the time of marriage there was intention not to perform marital obligations.* . .": 35 Am. Jur. 240-1 (Marriage §92 (1941) ). (Italics supplied).

Under the above authorities, we are satisfied that the law in Pennsylvania recognizes as a proper case for divorce for fraud, situations where one spouse at the time of the marriage ceremony deceives the other into believing that the first will perform the marriage duties when in fact that spouse has no intention, at the time of the ceremony, of performing those duties.

Of course the evidence of fraud must be "clear and satisfactory", and must preponderate. See Kissell v. Kissell, 163 Pa. Superior Ct. 288, 290 (1948).

The question therefore, on the instant record, is whether plaintiff husband has proved, by clear and satisfactory evidence, and a preponderance of the evidence, that Dorothy Keeney, at the time of the marriage ceremony, induced Charles Keeney to believe that she would perform the marital duties while at the same time she had no intention of doing so. We think he has.

It is undisputed that the parties were married November 30, 1959, separated after a violent argument June 6, 1960, and have not cohabited or had relations since. There are no children of the marriage.

Most of the rest of the record presents sharply conflicting testimony. As might be expected, both the husband and the wife assert that the other was the aggressor in the courtship, that he or she entered into the marriage with high hopes and sincere expectations, as well as affection. Each charges that the other brought about the destruction of the marriage. Therefore we must depend more upon conduct than words, and more upon the statements of third parties than those of the principals.

As to conduct, there is testimony, albeit contradicted by Dorothy, to the effect that after the marriage on November 30, 1959, Dorothy in February, 1960, or in March, 1960, saw counsel for advice concerning a divorce. It is also admitted that she saw counsel for the same purpose again on May 21, 1960, and May 26, 1960.

Further on May 22, 1960, Dorothy for the first time took up permanent residence in the home of Charles. Prior thereto she had maintained her separate residence, although she spent a number of, but by no means all, weekends prior to May 21 at the Keeney home, and stayed overnight on such weekends and on some other scattered occasions.

Dorothy admits that she took up permanent residence at Charles' house on advice of counsel. Moving in amounted to moving a bed for her son and a few other "odds and ends" into Charles' home. Even after Dorothy moved in, she and her son had breakfast at her own house. The preponderance of the evidence is that Dorothy did not perform or have performed the normal housekeeping tasks at Charles' home.

As to the testimony of third parties, one Dorothy R. Brenza stated that prior to the marriage Dorothy Keeney told Miss Brenza that she was going to marry Mr. Keeney as "strictly a business deal" on the theory that "you marry a rich man and get a lot of money from him out of a divorce settlement." Miss Brenza stated that when she pointed out that Mr. Keeney was older than Dorothy, Dorothy said "that did not matter" because she "had no intention of living with him." Miss Brenza testified that Dorothy stated after the marriage, when the two were not cohabiting, that Dorothy said that she would "never live with him." Despite the fact that Miss Brenza is currently Mr. Keeney's secretary, observation of the witness' demeanor and her manner of testifying to the several instances, well fixed as to time and place, when Dorothy is said to have made these statements, causes the master to believe the witness Brenza.

The witness McCaw corroborates the witness Brenza to some extent. Mrs. McCaw testified that Dorothy Keeney told her, in September prior to the marriage, that she, Dorothy, was "going to marry for money."

The witness McCaw further testifies that Dorothy told Mrs. McCaw in February that Dorothy had engaged an attorney and that she could not live with Charles.

Finally one item of testimony by Charles was both credible and significant. This was testimony that on an occasion in mid-January or early February, when there had been no matters which made him sense or believe that the marriage was in jeopardy, his wife suddenly stated that the marriage wasn't "going to work out", and they should break it up. This was substantially repeated March 26, 1960. It should also be noted that after moving in to Charles' home, May 22, 1960, Dorothy admitted that she made no attempt to sit down with Charles and talk over the difficulties in an attempt to save the marriage.

Dorothy's conduct in making a show of cohabitation and of conferring, once, with Mr. Keeney's minister does not therefore quite ring true. Her reasons for the failure of the marriage, i.e., disagreement over the publishing of a marriage announcement, and his sexual inadequacy, are not convincing.

As was noted in the Masciocchi case, supra, 72 D. & C. 257, 259 (1950):

" 'Fraud, as has so often been said, can rarely be proven by direct and positive testimony. . .' "

However, after carefully reviewing the testimony several times, we are persuaded that Dorothy entered into the marriage with an intention not to perform the marital duties, but for the purpose, as quickly as possible, of scuttling the marriage, and procuring a divorce with alimony for her own economic advancement. The relevant countervailing testimony which Dorothy introduced consisted chiefly of her denials of nearly everything about which each of the other witnesses had testified.

We wish to make clear that we are well aware that the mere fact that Dorothy may have married for

money is not per se a ground for divorce: "A match for wealth may be not the less a match for love": Cronise v. Cronise, 54 Pa. 255, 264 (1867).[2]

Nor is the fact that the spouse has not kept house as well as one might wish, or that the marriage bed has been a disappointment. When these things develop in the normal course of events, there is no "fraud". But the case is different where at the very time of the marriage the wife had no intent to remain married, to cohabit, to manage the husband's household, but intended from the beginning to assume no responsibilities of marriage, and as soon as possible thereafter, to procure divorce with alimony. This, we believe, is fraud which vitiates the marriage. This we believe to be the case at bar.

Fraud and reliance thereon having been proved, did Charles confirm the marriage thereafter? Again, we think the evidence proves he did not. Dorothy's statement in late January that the marriage would not succeed, and her interest in another job in March were bits of evidence for Charles that something was awry, but we cannot say they established the fraud. The pattern of fraud emerged clearly not earlier than May 22, 1960, and not later than June 6, 1960. Charles' full realization of fraud appears to have occurred on June 6, 1960. From that date forward, he did not confirm the marriage.

Therefore, we find as facts that:

1. Dorothy and Charles Keeney were married November 30, 1959.

2. There are no children of the marriage.

3. Dorothy represented at and prior to the marriage that she would faithfully perform the marital duties.

4. At the time of the marriage Dorothy intended, in

---

[2] As we read the Cronise case, this is all that it appears to decide on the point involving the law of divorce. If it decides more, we believe it has been modified by Allen's Appeal, supra.

fact, not to perform the marital duties. Rather she intended token performance of the marital duties and as soon as possible a divorce from bed and board for the purpose of procuring permanent alimony.

5. The husband Charles, in reliance on the representations of Dorothy that she would perform the marital duties, married Dorothy.

6. The husband Charles did not confirm the marriage after realizing the fraud of Dorothy.

7. The husband Charles is the injured and innocent spouse.

We hold as a matter of law that:

1. The aforesaid conduct of Dorothy constitutes fraud within the meaning of section 10(g) of the Divorce Code of 1929.

2. Dorothy's charges that Charles subjected her to cruel and barbarous treatment, indignities to the person and malicious abandonment are moot, in the light of the above findings of fact and the above conclusion of law.

3. The order for alimony pendente lite will cease to have effect upon the final termination of this proceeding.

While we believe Dorothy's charges are moot, we make the additional finding, for the sake of completeness, that she has not proved cruel and barbarous treatment, indignities to the person sufficient for divorce, or malicious abandonment by a preponderence of the evidence. We find further that even if she proved these charges, she is not the innocent and injured spouse.

We, therefore, recommend that:

1. A decree of divorce from the bonds of matrimony be entered in the suit of Charles Keeney v. Dorothy Keeney, no. 881 January term, 1961A.

2. Judgment be entered dismissing the complaint of Dorothy Keeney v. Charles Keeney, at no. 3462 July term, 1960B, for divorce from bed and board.

*Decree*

WEIR, J.—And now, August 13, 1962, after consideration of testimony and briefs filed, it is ordered and decreed that the exceptions filed by defendant, Dorothy L. Keeney, to the master's report be and are hereby dismissed. The report of the master is confirmed and the court, finding that the above defendant procured the marriage by fraud, which has not been subsequently confirmed by the acts of plaintiff, an injured and innocent spouse, orders and decrees that plaintiff, Charles R. Keeney, be and is hereby granted a divorce from the bonds of matrimony from defendant Dorothy L. Keeney.

*Order*

WEIR, J.—And now, August 13, 1962, after consideration of testimony and briefs filed, it is ordered and decreed that the exceptions filed by plaintiff, Dorothy L. Keeney, to the master's report be and are hereby dismissed. The report of the master is confirmed, and the complaint of plaintiff for a divorce from bed and board is dismissed.