No. 20,528.

A. L. ENTSMINGER, revived in the name of GEORGE YOUNG, as Administrator, etc., et al., *Appellees,* v. EMMA ENTSMINGER, revived in the name of ELLA JANESS et al., as Heirs at Law, etc., *Appellants.*

### SYLLABUS BY THE COURT.

1. MARRIAGE—*Induced by Fraudulent Representations of Wife—Physical and Mental Infirmities of Husband—Annulment of Marriage.* A marriage may be annulled for fraud where a man, weakened by age and by physical and mental disabilities, is induced to marry a woman who represents to him that her reputation is good and that she is a virtuous woman, but whose reputation for immorality is notorious, and who has been conducting a house of prostitution for many years.

2. SAME—*Fraud Not Condoned by Husband.* Such fraud is not waived nor condoned by subsequent cohabitation, where the woman, over the objection of the man, is guilty of like misconduct after the marriage.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed December 9, 1916. Affirmed.

*W. F. Schoch,* and *J. K. Rankin,* both of Topeka, for the appellants.

*Z. T. Hazen, R. H. Gaw,* and *J. S. Ensminger,* all of Topeka, for the appellees.

The opinion of the court was delivered by

MARSHALL, J.: The defendants appeal from a judgment annulling the marriage entered into between A. L. Entsminger and Emma Entsminger. The action was commenced by A. L. Entsminger, and in his petition he alleged, in substance:

"That on the 22d day of October, 1914, appellee and appellant were married; that appellee was past eighty years of age at the time of said marriage and was very infirm; that because of his physical infirmities his mind had become weakened and he could not grasp situations as he did in his younger days; that on account of his physical condition he was in great need of some one to take care of him; that on account of his condition he readily yielded to flattery and importuning; that he became acquainted with appellant shortly before the marriage, and that for the purpose of inducing appellee to marry appellant, she stated and represented to him that she had lived in the city of Topeka for many years, was well known, was a good and virtuous woman, had a good character and had never had any trouble; that appellee believed in and relied upon

Entsminger v. Entsminger.

the representations so made by appellant and by reason thereof was induced to marry her; that in fact appellant was not a good or virtuous woman, was not a woman of good character, and that she had run what was known as a bawdy house and had been arrested several times; that appellee was induced to marry appellant because of her false and fraudulent representations so made."

To this petition Emma Entsminger filed a demurrer, which was overruled. She then filed an answer which consisted of a general denial and a prayer for divorce.

On the trial special findings of fact were made as follows:

"First. On October 22nd, 1914, plaintiff and defendant were married in the City of Topeka, Shawnee County, Kansas. At the time of their marriage plaintiff had lived in Shawnee County for more than fifty years, and had been married three times prior to the present marriage; his two first wives were dead and the. third had been divorced. At the time of their marriage plaintiff was eighty-two years of age and was and had been a confirmed cripple for more than twenty years in such a way that he could only go from place to place with great difficulty and by the use of a crutch and cane; that it required considerable effort on his part to dress himself and was unable to properly care for himself. Plaintiff had lived at Silver Lake, Kansas, for a great many years prior to his moving to Topeka; he moved to Topeka about four years prior to his marriage with defendant. On account of his physical ailments and the difficulty with which he was able to go from place to place he came in contact with but few people. On account of his extreme age and his physical infirmities his mind had become greatly impaired and weakened. He belonged to the Odd Fellows Lodge at Silver Lake and shortly prior to his marriage with defendant the lodge appointed one Morton Hutchinson, who was well acquainted with him, a committee to investigate and report his then mental condition. In pursuance to this appointment Morton Hutchinson came to Topeka, called upon and talked with plaintiff and from his investigation was of the opinion that his mind was greatly weakened and impaired.

"Second. Defendant had lived in the City of Topeka for more than twenty years, and while there was no testimony as to her age, yet from appearance she was probably sixty years of age. For a great many years she and her daughter had conducted a house on Tenth Street in the City of Topeka between Jackson and Kansas. Avenue, commonly known and understood to be a house of prostitution; that the house that she was conducting there had a bad reputation; that after living on Tenth Street for many years she moved to 826 Monroe Street; that she conducted the same kind of a house on Monroe Street that she conducted on Tenth Street; that cab men frequently hauled men and women both day and night to her house, but in doing so they usually drove to Ninth Street before allowing passengers to alight and such passengers would walk back to defendant's house at 826 Monroe Street.

"Third. The acquaintance between plaintiff and defendant prior to their marriage was brief. Occasionally plaintiff passed the house where defendant was living on Monroe Street and defendant stopped him and entered into conversation with him, making certain suggestions with reference to treatment for his physical condition; that she frequently went to the sidewalk when she saw him coming and stopped him and conversed with him, and finally invited him into her house; that thereafter she invited him to come and take supper with her, which he did, and following this occasionally then went out buggy riding. That the question of marriage was suggested and defendant stated that she had lived in Topeka for a long time; that her reputation was good and that she was a virtuous woman; that plaintiff believed these statements and on account of his physical condition and desiring a home agreed to marry her; that defendant believed at the time of the marriage. that plaintiff possessed considerable property, but the only property he had was a house on Jefferson Street of the value of probably $2500, upon which there was a mortgage of $1400; that this house was renting for $20 per month. Shortly before the marriage plaintiff purchased a house on Monroe Street in the City of Topeka for which he agreed to pay $4500; that he paid $1500 cash and assumed the payment of a mortgage upon this property of $3000. Plaintiff has no property other than the above-described real estate and has no money and a very limited amount of personal property. The taxes and interest on the Monroe Street property are in default and a suit is now pending for the foreclosure of this $3000 mortgage. Plaintiff has no money with which to pay the taxes nor the interest either upon this Monroe Street property or upon his Jefferson Street property. Plaintiff believed at the time of his marriage to defendant that she was a good reputable woman and of good character and stood well in the. City of Topeka, and would make him a good home and he was caused to so believe by her representations, statements and conduct.

"Fourth. Soon after the purchase of the Monroe Street property plaintiff and defendant moved into this property and at the time of the bringing of this suit defendant was occupying the same, plaintiff having left the house on account of the conduct of the defendant and was living in the garage on the rear end of said property. After the marriage of plaintiff and defendant and after they had moved into the Monroe Street property defendant attempted to conduct the same kind of a house there that she had conducted on Tenth Street and at 826 Monroe Street. Plaintiff objected to the conducting of such a house and defendant said to him that there could be no money made by renting rooms, but that by allowing men and women to come and occupy rooms she could make some days as high as from five to ten dollars.

"Fifth. Defendant used the parlor of their house on Monroe Street as her bedroom and plaintiff occupied a different room of the house as a bedroom; that on one evening and after dark, while plaintiff and defendant were sitting in the dining room, the door bell rang and defendant went to the door, allowed a man to enter and to occupy a seat in her

bedroom. After he had been there a considerable time and about nine o'clock defendant suggested that it was time to retire, but plaintiff knew there was some person in defendant's bedroom and he then entered the room, turned on a light and found a man sitting in a chair close to her bed; that plaintiff ordered him out and he declined to go, and he then struck him with his cane, and the man left the house. At another time plaintiff had arranged for a carpenter to come to the house to make some repairs; that when the carpenter came he started with plaintiff upstairs when they were stopped by defendant and told that they could not go upstairs; that they then went out on the porch and in a very short time a man came downstairs and left the house, and a few minutes thereafter a woman came downstairs and also left the house; that on another occasion plaintiff found a man and a woman in one of the rooms upstairs during the daytime in their night clothes. Plaintiff protested and objected to the conducting of this kind of a house and finally left the house and a long time thereafter lived in the garage, and since that time has been occupying a room in another residence and getting his meals wherever he could do so.

"Sixth. That at the time of the marriage of plaintiff and defendant and for a long time prior thereto defendant was an immoral woman and the house that she kept was that of a house of prostitution, and that she had been engaged in this immoral practice for a great many years, and that while her reputation was notorious, yet plaintiff believed that she was a good virtuous and reputable woman and would not have married her if he had known her true character.

"Seventh. Defendant has no property except her household goods.

"Eighth. That the defendant had been a resident of the City of Topeka and Shawnee County, Kansas, for more than twenty years prior to the marriage.

"9. That during the time that plaintiff and defendant were acquainted prior to their marriage, plaintiff frequently called on her, took her out buggy riding a number of times; that they discussed the matter of their marriage; that on one occasion she voluntarily stated she was a virtuous woman and that she would make it warm for any one who said she did not have a good reputation.

"10. That at the time of the marriage of plaintiff and defendant she had no means or property; that plaintiff had a residence on Jefferson Street from which he was receiving $20 a month; that he placed a mortgage on this property for $1400 and with this sum and $100 in cash he had on hand, he purchased the property at 829 Monroe Street for $4500, assuming a mortgage thereon for the sum of $3000; that the plaintiff knew when he married defendant she was going to keep roomers and consented thereto; that plaintiff's income being insufficient, it was necessary for them to keep roomers to pay family expenses.

"11. That plaintiff at the time he married the defendant understood and appreciated that he was entering into a marriage contract."

The court declared a conclusion of law as follows:

"That the marriage contract entered into between plaintiff and defendant was induced through fraud and deception on behalf of defendant, and should, therefore, be set aside and held for naught."

Notice of appeal was served on the 20th day of December, 1915. A. L. Entsminger died on the 21st day of January, 1916, and Emma Ensminger died on the 9th day of February following. The action was revived, as to A. L. Entsminger, in the name of his heirs at law, and of his administrator, and was revived, as to Emma Entsminger, in the name of her heirs at law. The heirs of Emma Entsminger prosecute this appeal. The title to the property owned by A. L. Entsminger at the time of his death is involved in this action. The plaintiffs have filed a motion asking that the appeal be dismissed on the ground that this action is not one that can be revived, and that there is nothing for this court to decide. It is not necessary to pass on this motion for the reason that the judgment will be affirmed in disposing of the case on its merits.

1. The defendants ask that the judgment be reversed for the following reasons: First, that A. L. Entsminger, at the time he married Emma Entsminger, understood and appreciated that he was entering into a marriage contract; and, second, that false representations and concealments as to prior character and reputation are not grounds for annulling a marriage. These two propositions must be considered together, because A. L. Entsminger was an infirm old man with a weakened and impaired mind, and this condition made him easily subject to the influence of Emma Entsminger. She had conducted a house of prostitution for many years prior to her marriage to the plaintiff. She concealed this fact from the plaintiff and made false statements to him concerning her character. The defendant, by her arts, brought about the marriage. After the marriage she attempted to conduct the same kind of a house as she had conducted previously. To this the plaintiff objected. Because of the defendant's persistence in attempting to conduct a house of prostitution at their home the plaintiff left the house and lived in the garage.

The surrounding circumstances place this case within the rule of *Browning v. Browning,* 89 Kan. 98, 130 Pac. 852. In that case a young man in his nonage sought to have his marriage annulled. He had been inveigled into the marriage by

·an immoral woman who made false representations to him concerning her previous marriage relations. In the present case an old man in his dotage sought to have his marriage annulled. He was inveigled into the marriage relation through the false representations of an immoral woman. The conduct of the defendant in the present case was more reprehensible than that of the defendant in the Browning case. The condition of the plaintiff in the present case rendered him·more susceptible to the wiles of an immoral woman than did the condition of the plaintiff in the Browning case.

The defendants cite *Varney v. Varney,* 52 Wis. 120, to support their contention that a marriage·can not be annulled because of false representations made before the marriage as to previous chastity. There is nothing in the Varney case to show that the party there defrauded was weakened by age or by mental or physical disability. That case states and follows the general rule. This rule is stated in *Browning v Browning,* supra, on page 102, in a quotation taken from 26 Cyc. 905. The remainder of the paragraph in Cyc., from which the quotation in the Browning case is taken, is as follows:

"But some courts are disposed to relax the severity of this rule, especially where the fraud or deceit has been accompanied by some measure of coercion or imposition, in the case of very young girls duped or decoyed into an unsuitable marriage, and in the case of aged persons of feeble intelligence who have been tricked or deluded. In every case, however, the fraud must have been an effective cause, and one can not complain of a false representation where he knew the truth at the time, where it was rendered possible only by his own previous immoral conduct, or where the fraud only affects third persons. Imposition in the nature of a fraud may also be ground for annulling the marriage, especially where it was exerted by playing upon the party's superstitions or religious delusions." (p. 906.)

2. The defendants insist that A. L. Entsminger, by his subsequent cohabitation with Emma Entsminger, condoned her misconduct and false representations, and ratified the marriage contract. Emma Entsminger did not plead condonement as a defense to the action, but the question of condonement will be considered. The evidence shows that on the day after his marriage A. L. Entsminger was told of his wife's previous reputation and conduct, and shows that he thereafter continued to live with her. It does not appear that A. L. Ents-

minger believed what he was told. He was not under any obligation to do so. Even if he did receive knowledge of his wife's previous misconduct and condoned that misconduct it was with the understanding that her conduct in the future would be right and proper. She was guilty of the same kind of misconduct after the marriage. If the law of condonation has any place in this controversy that misconduct revived the previous offenses. (9 R. C. L. 384; 14 Cyc. 637.) The conduct of A. L. Entsminger might have amounted to condonation if he had been a vigorous man in full possession of his mental faculties. When his physical and mental condition are taken into consideration the evidence is not sufficient to show a condonement of the fraud committed against him.

The judgment is affirmed.