ANONYMOUS, Plaintiff, v. ANONYMOUS, Defendant.

462

(*December* 4, 1951.)

HERRMANN, J., sitting.

*Arthur G. Logan* and *Stephen E. Hamilton, Jr.,* (of Logan, Marvel and Boggs) for Plaintiff.

*James R. Morford, William H. Bennethum* and *William Marvel* (of Morford, Bennethum, Marvel and Cooch) for Defendant.

Superior Court for New Castle County.

HERRMANN, J.:

The plaintiff seeks the annulment of his marriage to the defendant on the grounds (1) that, by reason of a void divorce decree, the defendant had a husband living at the time of her marriage with the plaintiff; and (2) that the plaintiff's marriage to the defendant was procurred by fraud[1].

At the close of the plaintiff's case, the defendant moved for a dismissal of the petition on the ground that under the facts and the law the plaintiff was not entitled to a decree of annulment. The Court declined to rule on the motion at that stage of the case[2].

There is no conflict in the evidence as to the following facts:

---

[1]Paragraph 3497, *Revised Code of Delaware,* 1935, provides:
"A marriage may be annulled for any of the following causes existing at the time of the marriage:

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

"(c) When such marriage was contracted while either of the parties thereto had a husband or wife living, at the suit of either party.

"(d) Fraud, force or coercion, at the suit of the innocent and injured party, unless the marriage has been confirmed by the acts of the injured party."

[2]Superior Court Rule 41(b) provides: "&ast; &ast; &ast; After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. In an action tried by the court, without a jury, the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. &ast; &ast; &ast."

The plaintiff and the defendant were married in New York City on November 20, 1948. This was the second marriage for each of them.

The defendant had married Willard R. Wigley in 1934, and they resided together in Waco, Texas. In June of 1936, the defendant decided to seek a career in motion pictures. She left Waco and went to California, first accompanied by her dramatic coach and later joined there by her mother. Wigley remained in Waco. He did not object to the defendant's professional aspirations nor to her departure from Texas in an effort to fulfill them. The defendant was not successful in California and in the Fall of 1937, accompanied by her mother and with Wigley's consent, she left California and went to New York City to seek a theatrical career. In 1938, Wigley visited the defendant in New York for about a month.

Shortly after her arrival in New York, the defendant met a certain man who undertook to sponsor her in the pursuit of a career. This was the beginning of a relationship which lasted until 1948. During the period from 1939 to September 1948, the defendant received from that person large sums of money, mostly in monthly installments.

In 1939, the defendant and her mother returned to Waco for a short period of time and the defendant lived with Wigley during this stay. The defendant and her mother then returned to New York. Later in 1939, the defendant joined Wigley in Chicago for about a week. During this entire period, Wigley periodically sent money to the defendant for her support.

In the Spring of 1940, the defendant again returned to Waco. At first she lived with Wigley, but later she left him and lived at her mother's home in Waco. On June 4, 1940, the defendant filed a petition for divorce in the District Court for McLennan County, Texas, on the ground of cruelty. Wigley entered a general appearance in the divorce action, waived citation, and did not defend. The hearing on the petition was had on July 6, 1940. The defendant was the only witness heard and

no record of her testimony was made. Judge Giles P. Lester thereupon entered a decree[3] divorcing the defendant from Wigley. There were no children of this marriage. Wigley is still living.

Shortly after the divorce decree was granted, the defendant and her mother returned to New York. The defendant became very active in certain New York society circles. She was quite popular and, during the period 1940 to 1948, she had a number of suitors including several men of wealth and social prominence.

The plaintiff met the defendant on April 1, 1947. The meeting had been arranged at the plaintiff's request by a mutual friend. At that time, the plaintiff was married and living with his wife in Delaware. He had been married for 23 years and was, at 47 years of age, a man of education and sophistication. After the initial meeting, the plaintiff sought other meetings with the defendant. About a month after their first meeting, the plaintiff and the defendant spent a weekend together at a resort and they had sexual relations there. From that time and until their marriage in November 1948, the plaintiff and the defendant had sexual relations at regular and frequent intervals.

---

[3]The decree reads as follows:

"On this 6th day of July A.D. 1940, this cause coming on in its regular order to be heard, came the Plaintiff in person and by attorney, and announced ready for trial; and the Defendant, although having waived time and the issuance and service of citation failed to appear and answer herein, but wholly made default. And a jury being waived, all matters of fact, as well as of law were submitted to the Court; and the Court having heard and fully considered the pleadings, evidence and argument of counsel, and being in all things fully advised, is of the opinion that all the material allegations in Plaintiff's petition are true, and that the divorce should be granted as therein prayed.

"It Is Therefore Ordered, Adjudged and Decreed by the Court, that the bonds of matrimony heretofore existing between the Plaintiff, * * * and the Defendant, W. R. Wigley, be and the same are hereby in all things, forever dissolved and annulled, and the said Plaintiff is hereby divorced from the said Defendant. It is further ordered that Plaintiff do have and recover of and from the Defendant, all costs in this behalf expended, for which execution may issue; execution may issue, also, in favor of the officers of this Court against each party hereto for the cost by him or her respectively incurred herein."

At some time prior to October 1947, the plaintiff and the defendant discussed marriage. In October 1947, the plaintiff left his wife. He continued to see the defendant constantly in the ensuing period and they continued to discuss marriage. The plaintiff made certain investigations as to the defendant's background. During the period of courtship, the plaintiff acquired certain definite impressions of the defendant as the result of her statements to him or as the result of his observations of her. He was of the opinion that the defendant was a person of good moral character; that she and her mother were living on the defendant's patrimony and on money furnished by Wigley; that the defendant's divorce from Wigley had been granted on the ground of Wigley's impotence; and that the defendant was in love with him and wished to be his wife.

In July 1948, the plaintiff's wife obtained a divorce in Wyoming and on November 20, 1948, the plaintiff and the defendant were married in New York City. They established their matrimonial domicile in Delaware and lived together until July 28, 1950. On that date the plaintiff left the home. The separation was caused by quarrels over money and other family matters. In October 1950, the defendant brought an action against the plaintiff in the Court of Chancery for maintenance and support. During certain discovery proceedings in that action, the plaintiff acquired information upon the basis of which he formed the belief that the defendant's Texas divorce decree was fatally defective. This action for annulment, based upon the invalidity of the defendant's divorce, was thereafter filed. Later, the plaintiff received information upon the basis of which he amended his petition in this action to include the counts alleging fraud in the procurement of the marriage.

Those are the uncontroverted facts. The evidence is in irreconcilable conflict, however, as to certain other facts.

The plaintiff asserts, and the defendant denies, that the evidence establishes the following ultimate facts regarding the defendant's Texas divorce decree:

1. That the defendant had abandoned her residence in Texas before filing her petition for divorce.

2. That the ground of cruelty was false and was arrived at by the defendant and Wigley by collusive agreement.

3. That at the hearing on the divorce petition, the defendant lied as to her residence and as to the merits of the case.

The plaintiff further asserts, and the defendant denies, that the evidence establishes the following ultimate facts regarding the charge that the defendant procured marriage with the plaintiff by fraud:

1. That during the period 1938 to 1948, the defendant engaged in meretricious relationships with several men, and that the defendant concealed these facts from the plaintiff.

2. That, during that period of time, the defendant lived on money received by her from men with whom she had meretricious relations, and that the defendant concealed these facts from the plaintiff.

3. That the defendant married the plaintiff for his money and not because she loved him, and that her premarital representations of love and affection were false and fraudulent.

4. That the defendant knew her Texas divorce decree was procured by fraud and collusion, and that the defendant concealed these facts from the plaintiff.

Fortunately, it is not necessary to announce findings regarding the controverted facts. As a matter of law, by the application of the principles which I consider to be controlling, the plaintiff may not prevail in this proceeding even though his contentions as to all of the controverted facts be accepted.

Three questions of law are presented, the resolution of which disposes of this case. For the purpose of resolving those questions, I assume as true the controverted facts as asserted by the plaintiff. The three legal issues are as follows:

I. May the plaintiff impeach the defendant's Texas divorce decree in this action?

II. Does the law of the forum govern in an action to annul a marriage on the ground of fraud?

III. Do the alleged concealments and misrepresentations of the defendant constitute "fraud" under the law of Delaware pertaining to annulment of marriage?

## *I.*

This is a collateral attack by which the plaintiff in this action, a stranger to the divorce action, attempts to impeach the defendant's Texas divorce decree.

This Court is confronted, immediately and inexorably, by the Full Faith and Credit Clause of the Federal Constitution and the implementing Federal Statute.[4] This Court may allow the plaintiff to thus assail the Texas judgment only if the Full Faith and Credit Clause permits.

The Supreme Court of the United States has recently held that, by virtue of the Full Faith and Credit Clause, a State may not permit a collateral attack upon an out-of-state divorce decree by a stranger to the divorce action, upon the ground of lack of jurisdiction, unless such an attack would have been permitted in the Courts of the granting State. *Johnson v. Muelberger*, 340 *U. S.* 581, 71 *S. Ct.* 474, 95 *L. Ed.* 552. In the cited case, just as in the case at bar, the defendant spouse had entered a personal appearance in the divorce proceeding. If this is the rule where the challenge is on jurisdictional grounds, surely it is the rule where,

---

[4]*U. S. Const. Art. IV*, § 1: "Section 1. Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State. * * *"

28 *U. S. C. A.* § 1738: "Such Acts, records and judicial proceedings * * * shall have the same full faith and credit in every court within the United States * * * as they have by law or usage in the courts of such State, * * * from which they are taken."

as here, the challenge is not jurisdictional. I am of the opinion that the *Johnson* case is controlling in this phase of the instant case.

The issue is thus squarely presented: Would the plaintiff in this case be permitted in Texas to make a collateral attack upon the defendant's divorce decree? If not, such impeachment of the Texas judgment is barred in Delaware, as in any other State, because it is forbidden by the Full Faith and Credit Clause.

No Texas case directly in point has come to my attention. I am obliged, therefore, to ascertain the status of certain pertinent principles under the law of Texas and to draw the necessary conclusions therefrom.

The Texas decree did not affect any right or interest acquired by the plaintiff prior to its rendition. Texas has adopted the general rule that a stranger to a judgment may impeach it in a collateral proceeding only if the judgment prejudices him as to some pre-existing right.

The general rule is well stated at 1 *Freeman on Judgments* (*5th Ed.*) 636, § 319: "It is only those strangers who, if the judgment were given full credit and effect would be prejudiced in regard to some pre-existing right, that are permitted to impeach the judgment. Being neither parties to the action, nor entitled to manage the cause nor appeal from the judgment, they are by law allowed to impeach it whenever it is attempted to be enforced against them so as to affect rights or interests acquired prior to its rendition."

The rule is stated in slightly different fashion at 34 *C. J.* 526, § 832, as follows: "A stranger to the record, who was not a party to the action in which the judgment was rendered nor in privity with a party, is not prohibited from impeaching the validity of the judgment in a collateral proceeding; but in order to do so he must show that he has rights, claims, or interests which would be prejudiced or injuriously affected by the enforcement of the judgment, and which accrued prior to its ren-

dition, unless the judgment is absolutely void. \* \* \*." See, also, 49 *C. J. S., Judgments*, § 414.

It is clear that Texas recognizes and adheres to this general "pre-existing right" rule. *Sanger v. Tramwell*, 66 *Tex.* 361, 1 *S. W.* 378, 379; *Urban v. Bagby, Tex. Com. of App.*, 291 *S. W.* 537, 538; *National Loan & Investment Co. v. L. W. Pelphrey & Co., Tex. Civ. App.*, 39 *S. W.* 2d 926, 928.

It is thus apparent that the plaintiff falls within that category of strangers not permitted, under Texas law, to impeach collaterally judgments to which they were not parties and concerning which they had no pre-existing rights or interests.

The plaintiff contends, however, that the "pre-existing right" doctrine does not apply in the instant case because the Texas decree, having been procured by fraud and collusion, was absolutely void and a nullity. This contention is not in accord with the law of Texas.

■ The fraud alleged here consists of a charge that the judgment was procured by a collusive and fraudulent agreement between the defendant and Wigley regarding the grounds and merits of the divorce action and regarding the defendant's residence in Texas. The fraud asserted does not go to the jurisdiction of the Texas Court which granted the divorce decree, either as to the subject matter or the parties of the divorce action.

. With respect, first, to jurisdiction of the subject matter, no question has been raised by the plaintiff as to the power and jurisdiction of the District Court of McLennan County, Texas, to hear and determine divorce actions and to issue divorce decrees. It is clear that the Texas Court had jurisdiction of the subject matter and that such jurisdiction was adequately invoked by a petition filed by the defendant in this action. 1 *Freeman on Judgments* (5th Ed.) 674, § 337.

■ With respect to jurisdiction over the parties in the divorce action, there is no question raised regarding the Texas

Court's jurisdiction over Wigley. The plaintiff here does contend, however, that the defendant conspired and committed perjury to defeat the residence requirements of the Texas divorce statutes[5] which governed her as party plaintiff in the divorce action. The Texas residence requirements for divorce are not jurisdictional. *Aucutt v. Aucutt*, 122 *Tex.* 518, 62 *S. W.* 2d 77, 89 *A. L. R.* 1198; *Buffaloe v. Buffaloe, Tex. Civ. App.*, 210 *S. W.* 2d 429; *Wheelis v. Wheelis, Tex. Civ. App.*, 226 *S. W.* 2d 224; *Therwhanger v. Therwhanger, Tex. Civ. App.*, 175 *S. W.* 2d 704. Thus, the fraud asserted by the plaintiff, regarding the defendant's residential status in Texas at the time she filed her divorce action, does not go to the jurisdiction of the Texas Court.

It is manifest, therefore, that the plaintiff's charges of fraud in the procurement of the divorce do not go to the jurisdiction of the Texas Court, either as to the subject matter or the parties.

Under Texas law, a domestic judgment cannot be collaterally impeached for fraud not going to the jurisdiction of the Court which rendered the judgment. Relief on this ground must be obtained, under the law of that State, in some direct proceeding, as by motion, appeal or action in equity. A judgment rendered in Texas by a Court which has "potential jurisdiction" of the subject matter, and which is valid and binding on its face, is not void; it is merely voidable. It is settled in Texas that a judgment is absolutely void and a nullity only when a lack of jurisdiction of the Court rendering the judgment is disclosed by the record. *Litton v. Waters, Tex. Civ. App.*, 161 *S. W.* 2d 1095, 1096; *Security Trust Co., etc. v. Lipscomb County*, 142 *Tex.* 572, 180 *S. W.* 2d 151, 156. In order for a judgment to be subject to a collateral attack in that State, it must be absolutely

---

[5] *Art.* 4631, *Tex. Rev. Civ. Stat., Vernon's Ann. Civ. St. art.* 4631, provides:
"No suit for divorce shall be maintained in the Courts of this State unless the petitioner for such divorce shall at "the time of exhibiting his or her petition, be an actual bona fide inhabitant of this State for a period of twelve (12) months, and shall have resided in the county where the suit is filed for six (6) months next preceding the filing of same. * * *"

void, and if it is merely voidable it must be assailed by a direct attack. *Wilson v. King, Tex. Civ. App.*, 148 S. W. 2d 442, 445; *Higgins v. Bordages*, 88 *Tex.* 458, 31 S. W. 52; 25 *Tex. Jur.* 692, § 254, 703, § 259.

Further, under the law of Texas, a judgment of a Court of competent jurisdiction cannot be collaterally attacked unless the record affirmatively shows lack of jurisdiction. *Douglas v. State*, 58 *Tex. Cr. R.* 122, 124 S. W. 933, 936; *State Mortgage Corporation v. Traylor*, 120 *Tex.* 148, 36 S. W. 2d 440, 443; *Carroll v. McLeod*, 133 *Tex.* 571, 130 S. W. 2d 277, 279. If the record reveals no lack of jurisdiction, or is silent as to the requisite jurisdictional facts, the judgment is invulnerable to collateral attack. *Hollis v. Hollis, Tex. Civ. App.*, 226 S. W. 2d 129, 133; *Carroll v. McLeod, supra.*

In conformity with these principles, the general rule under the law of Texas is that fraud in the procurement of a judgment, regular on its face, does not render the judgment void, but only voidable. *Johnston v. Stephens, Tex. Civ. App.*, 300 S. W. 225, 228; *Hollis v. Hollis, supra; Uvalde Paving Co. v. Crabb, Tex. Civ. App.*, 7 S. W. 2d 678, 682; *Bragdon v. Wright, Tex. Civ. App.*, 142 S. W. 703, 705. Collusion is recognized specifically as being within this rule. *De Beque v. Ligon, Tex. Civ. App.*, 286 S. W. 749, 756; *Ferguson v. Ferguson, Tex. Civ. App.*, 98 S. W. 2d 847, 849.

The applicable principles are summarized in *Johnson v. Stephens, supra* [300 S. W. 2d 228], as follows: "We then have a judgment of a court of general jurisdiction, valid upon its face. Even if there was fraud in its procurement, the judgment is not void, but only voidable. * * *. It has many times been decided by the courts that a judgment valid upon its face can be attacked only in a direct proceeding instituted for that purpose."

The recitation of these established principles makes it apparent that the law of Texas favors, perhaps to an excep-

tional degree, the stability and finality of judgments and that absolute verity is accorded to the judgment record in a collateral proceeding to impeach the judgment.

I am of the opinion, therefore, that the defendant's divorce decree is not void under the law of Texas, even if assumed to be collusive, and that the "pre-existing rights" doctrine would be applied if the plaintiff attempted to impeach the defendant's divorce decree in a collateral proceeding in Texas.

The plaintiff cites two Texas cases in support of his contention that a Texas divorce decree, procured by fraud and collusion, is void, and not merely voidable: *Texas & P. Ry Co. v. Gay*, 86 *Tex.* 571, 26 *S. W.* 599, 25 *L. R. A.* 52, and *Smith v. Brown*, 3 *Tex.* 360, 49 *Am. Dec.* 748. Neither of these cases establishes that the plaintiff's contention is the law of Texas, and I do not so regard them.

In the *Gay* case, it was held that where a railway company collusively permits a person to be appointed its receiver by a court which did not have jurisdiction to make such appointment, that person was the agent of the company as though made an agent in the ordinary manner. In accordance with the prevailing Texas rule, the Court permitted a collateral attack upon the appointment of the receiver and considered the appointment a nullity because made by a court which lacked jurisdiction. The opinion in this case contains certain dicta which may be said to support the plaintiff's position. Suffice it to say that the Courts of Texas, including the Supreme Court of that State, have, in the intervening years, disregarded the statements in the *Gay* case upon which the plaintiff now relies.

The *Smith* case is wholly inapposite. That case was a fictitious case arising from a wager. In the case at bar, the parties to the divorce action were married and the action was not fictional, even if it be assumed that collusion was present.

The plaintiff also urges that, even if collusion is

not established, the fraud alleged constitutes "basic and extrinsic fraud", such as will render the divorce decree subject to collateral attack. According to my understanding of the prevailing rule in Texas, no distinction is made between extrinsic and intrinsic fraud in the application of the principle that a judgment, valid upon its face, can be attacked only in a direct proceeding instituted for that purpose. Moreover, the plaintiff would not be aided if such distinction existed under Texas law. The fraud asserted goes to the existence of the cause of action in the divorce case. Such fraud is intrinsic and not extrinsic fraud. 2 *Beale, Conflict of Laws, p.* 1403.

 █ Accordingly, I have reached the conclusion that, under Texas law, a putative husband, being a stranger without then existing interest in his wife's prior divorce decree, may not impeach it in a collateral proceeding especially if the record does not affirmatively show lack of jurisdiction of the Court which rendered the decree.

 █ In the instant case, the record of the divorce decree does not affiramtively show lack of jurisdiction. I am convinced that the plaintiff would not be permitted in Texas to impeach the defendant's divorce decree in a collateral proceeding. Accordingly, this Court is forbidden by the Full Faith and Credit Clause to permit him to do so in Delaware.

There remain for decision the two questions of law raised by the plaintiff's contention that, under his version of the evidence and the law, his marriage with the defendant was procured by fraud which warrants a decree of annulment.

## II.

The plaintiff urges that, in the consideration of fraud as a ground for annulment in this case, this Court is governed by the

law of New York,[6] the place of the marriage, and not by the law of Delaware, the place of the marital domicile.

The question is a vital one because the law of New York, regarding fraud as a ground for annulment of marriage, is distinctive in its leniency. It has been said that "a New York action to annul a marriage excels every other marital remedy in every other State of the United States, not only in the greatest number and variety of grounds for terminating the marriage, but also in the surpassing ease and superior mode of proving such grounds. * * * For instance the general ground of Fraud or Misrepresentation has afforded more than one hundred fifty particular grounds for annulment * * *." *Clevenger, Annulment of Marriage,* 25, 26. And it is said that it is "as easy to get an annulment in New York as a divorce anywhere in the United States." *Taylor v. Taylor,* 181 *Misc.* 306, 47 *N. Y. S.* 2d 401, 402.

Under the law of New York, a marriage is considered, legally, in the same light as any other civil contract. Any misrepresentation which would avoid an ordinary contract is sufficient to annul a marriage. Any misrepresentation which induces the giving of consent to marriage is adequate ground for annulment where such misrepresentation is "material to that degree that, had it not been practiced, the party deceived would not have consented to the marriage" and is "of such a nature as to deceive an ordinarily prudent person". *Di Lorenzo v. Di Lorenzo,* 174 *N. Y.* 467, 67 *N. E.* 63, 64, 63 *L. R. A.* 92; *Shonfeld v. Shonfeld,* 260 *N. Y.* 477, 184 *N. E.* 60.

Delaware, on the other hand, adheres to the orthodox rule that only such fraud "as goes to the very essentials of the marriage relation" will suffice as ground for annulment. *Williams v. Williams,* 2 *W. W. Harr.* 39, 118 *A.* 638.

---

[6]*Sec.* 7, *N. Y. Domestic Relations Law, McKinney's Consol. Laws,* c. 14, provides: "A marriage is void from the time its nullity is declared by a court of competent jurisdiction if either party thereto: * * * 4. Consents to such marriage by reason of force, duress or fraud; * * *."

*Sec.* 10, *ibid,* provides: "Marriage, so far as its validity in law is concerned, continues to be a civil contract, to which the consent of parties capable in law of making a contract is essential."

■ In support of his contention that the law of New York controls, the plaintiff relies upon the generally accepted rules that the law governing the validity of a marriage is, with few exceptions, that of the place where the marriage was celebrated and, the corollary, that the law governing the nullity of a marriage is the law of the place where the marriage was contracted.

■ This Court has recognized the general principle that a marriage valid under the *lex loci contractus* is valid in Delaware. *Petras v. Petras,* 7 *Boyce* 290, 105 *A.* 835. Perhaps, in a proper case, this Court would adopt the corollary that a marriage void where celebrated is void everywhere. It does not follow from the rule or its corollary, however, that a marriage *voidable* under the *lex loci contractus* is voidable everywhere, and that is the question which is presented for decision.

■ The term "annulment" embraces "two distinct concepts: (1) the declaration of the voidness of a purported marriage which has never legally existed, and, (2) the judicial avoidance or disaffirmance of a merely voidable marriage." 3 *Nelson, Divorce & Annulment,* § 31.01.

■ A marriage procured by fraud is, at most, a voidable marriage, as distinguished from a void marriage. This is so under the law of New York, *Shonfeld v. Shonfeld, supra; N. Y. Dom. Rel. Law,* § 7; *N. Y. Civil Practice Act,* §§ 1132, 1139, as well as under the law of Delaware, 1935 *Code,* §§ 3497(d), 3485.

Hence, by his assertions that his marriage was procured by fraud, the plaintiff is saying that it is voidable. Since the marriage cannot be said to be void, it is valid in this State and in New York until declared otherwise by judicial decree. 38 *C. J., p.* 1280, 1300; 55 *C. J. S., Marriage,* §§ 7, 34; *Scularekes v. Gullett,* 106 *N. J. Eq.* 369, 150 *A.* 826; *Barker v. Barker,* 172 *App. Div.* 244, 158 *N. Y. S.* 413. We thus have a situation wherein a Delaware Court is being asked to set aside a marriage which is presently valid and binding upon two persons whose marital

domicile is in Delaware. It is said, however, that in nullifying such existing marriage, this Court is obliged, by established rule of conflict of laws, to adopt and to apply the law of a sister state. I cannot agree with this contention.

In Delaware, marriage is more than a contractual relationship, subject to the ordinary rules of contract law; it is a status, defined and established by law, and this State has assumed the authority to control that status insofar as its domiciliaries are concerned. *Cohen v. Cohen,* 3 *Boyce* 361, 84 *A.* 122; *Petras v. Petras, supra.* The annulment of a voidable marriage is, like the granting of a divorce, nothing more than the regulation and alteration of that status. *Heath v. Heath,* 85 *N. H.* 419, 159 *A.* 418. As in divorce, the state primarily concerned is the state of domicile. Just as the law of the forum determines the causes for divorce and the qualifications surrounding the granting of the decree, so, I think, the law of the forum should govern causes and qualifications for the annulment of a marriage which is valid until judicially declared otherwise. I can conceive of no reason for a different rule.

The principle that the *lex loci contractus* governs the validity and the nullity of a marriage has reasonable foundation in the rules of comity and is required by practical considerations, for otherwise parties may be married in one jurisdiction and unmarried in another. There are no such principles of comity or practical considerations involved with respect to voidable marriages, however, for such marriages are valid until pronounced annulled by a court of competent jurisdiction.

If this Court were obliged to adopt the law of New York in this case, several fundamental concepts well established under the law of Delaware would be violated. First, as has been seen, marriage under New York law is legally nothing more than a civil contract to which the ordinary principles of contract law are applied; under Delaware law, on the other hand, marriage is a status having a special and unique sanctity

in the eyes of the law. Secondly, under New York law, a marriage, the consent to which was procured by fraud "is void from the time its nullity is declared by a court of competent jurisdiction", § 7, *N. Y. Dom. Rel. Law*, thus, indeed, attributing to an annulment decree the nature and effect of a divorce, *Restatement of Conflict of Laws, p.* 175, *Comment on* § 115(2); under Delaware law, however, a decree of nullity relates back to the time of the marriage and renders the marriage void *ab initio*. *Fluharty v. Fluharty*, 8 *W. W. Harr.* 487, 193 *A.* 838; *Wigder v. Wigder*, 188 *A.* 235, 14 *N. J. Misc.* 880. Moreover, it has been held that the Delaware statute on annulments must be strictly construed, *Warren v. Warren*, 4 *Terry* 399, 47 *A.* 2d 795; and that Delaware public policy forbids the annulment of a consummated marriage except on the most convincing proof. *Price v. Price*, 8 *W. W. Harr.* 172, 190 *A.* 104. In short, the policy of our law on the subject of annulment of marriage is ultraconservative as compared to the extremely liberal concepts of the law of New York.

■■■ I am of the opinion that, in considering the voidability of the marriage of domiciliaries of Delaware, this Court is not obliged, by reason of rules of conflict of laws, comity, or otherwise, to apply foreign statutes or principles of law which are repugnant to our basic concepts. When a plaintiff invokes the jurisdiction of the forum of his domicile to seek the annulment of a voidable marriage, he should be governed, I think, by the law of the forum. He is not entitled to have the law of another State substituted for that of his own. I conclude, therefore, that the voidability of a marriage is governed by the law of the forum.

This conclusion is in accord with the rule established in New Jersey. *Jimenez v. Jimenez,* 93 *N. J. Eq.* 257, 116 *A.* 788; *Capasso v. Colonna*, 95 *N. J. Eq.* 35, 122 *A.* 378, affirmed 96 *N. J. Eq.* 385, 124 *A.* 760. In *Capasso v. Colonna, supra*, it is stated, 122 *A.* 378: "The validity of a marriage is determined by the *lex loci contractus*, and it is dissolvable by the *lex domicilii.* * * *.

And the nullity of a voidable marriage is also governed by the *lex domicilii.* * * *."

A marriage legally solemnized elsewhere is valid in New Jersey. *Bolmer v. Edsall,* 90 *N. J. Eq.* 299, 106 *A.* 646. A marriage invalid where contracted is invalid in New Jersey. *Schaffer v. Krestovnikow,* 88 *N. J. Eq.* 192, 102 *A.* 246, affirmed 89 *N. J. Eq.* 549, 105 *A.* 239. Thus, it is apparent that New Jersey has recognized a separate rule for dissolution of marriages by divorce and for annulments of voidable marriages. *Cf. Sturm v. Sturm,* 111 *N. J. Eq.* 579, 163 *A.* 5, 7. I subscribe to this distinction.

This view is also supported by the author at 3 *Nelson, Divorce & Annulment, pp.* 284, 285: "* * *. The jurisdiction to entertain an annulment suit, the causes for which a voidable marriage may be annulled, and the defenses which may be interposed, are governed by the law of the domicile. * * *. Where a marriage is not void under the law of the state in which it was contracted, its status is to be determined according to the law of the forum, and an annulment may be granted only for a cause recognized by that law. * * *."

See also *Lyon v. Lyon,* 230 *Ill.* 366, 82 *N. E.* 850, 13 *L. R. A.* (*N. S.*) 996; *Johnson v. Johnson,* 257 *Ill. App.* 587; *Portwood v. Portwood, Tex. Civ. App.,* 109 *S. W.* 2d 515.

The conclusion which I have reached is in conflict with *Damaskinos v. Damaskinos,* (1950) 325 *Mass.* 217, 89 *N. E.* 2d 766, upon which the plaintiff places principal reliance. That case, typical of others cited by the plaintiff, does not recognize a difference between the conflict of laws rule applicable to void marriages and that to be applied to voidable marriages. I am constrained to reject the rule of the *Damaskinos* case for I do not think that it is supported by the better legal reasoning or justified by a sound public policy.

The other authorities upon which the plaintiff places his main reliance are 2 *Beale, Conflict of Laws,* §§ 121.2, 136.1 and

*Restatement of Conflict of Laws,* §§ 115 (1), 136. These authorities deal with the general conflict of laws rule governing valid and void marriages. Insofar as they discuss voidable marriages, I do not consider them to be in conflict with the conclusion reached herein.

Finally, there remains the question of the effect of the application of Delaware law to the plaintiff's assertions of fraud.

### III.

Briefly stated, the plaintiff's contentions of fraud are that the defendant induced the plaintiff to marry her by making premarital misrepresentations concerning (1) her moral character and conduct, (2) her state of mind toward the plaintiff, and (3) the validity and grounds of her Texas divorce decree.

Tested by Delaware law, the misrepresentations alleged by the plaintiff do not constitute the type of fraud which affords ground for annulment of marriage.

Fraud, within the meaning of our annulment statute, is defined in *Williams v. Williams,* 2 *W. W. Harr.* 39, 118 *A.* 638, 639, as follows: "Fraud is made by the statute one of the grounds upon which a marriage may be annulled. Fraud, itself, is a generic term embracing many varying forms of deception. It may be actively pronounced or brought about by disingenuous silences. It is, however, not every deception or fraud that will annul a marriage, but only such fraud as goes to the very essentials of the marriage relation. * * *."

See also *Doe v. Doe,* 5 *W. W. Harr.* 301, 165 *A.* 156; *Babis v. Babis,* 6 *Terry* 496, 75 *A.* 2d 580.

Under the law of Delaware, concealments and misrepresentations as to personal traits and character do not amount to fraud. *Williams v. Williams, supra.* Concealment of immorality, consisting of premarital unchastity, is within this rule.

It is settled by the overwhelming weight of authority, both in the United States and in England, that antenuptial chastity is not an essential element of the marriage relation, and that, in the absence of statute, concealment of premarital unchastity does not amount to fraud affording ground for annulment of the marriage. *Morris v. Morris*, 1 *Terry* 480, 483, 13 *A.* 2d 603, *dictum;* 82 *A. L. R.* 532, *et seq.;* 15 *A. L. R.* 2d 714, *et seq.; Lindquist v. Lindquist*, 130 *N. J. Eq.* 11, 20 *A.* 2d 325; *Reynolds v. Reynolds*, 3 *Allen, Mass.,* 605; *Allen's Appeal*, 99 *Pa.* 196; *Varney v. Varney*, 52 *Wis.* 120, 8 *N. W.* 739. The law recognizes a distinction in cases involving pregnancy or asserted pregnancy at the time of marriage. *Morris v. Morris, supra.* Further, the general rule has been considered inapplicable when exceptional circumstances are present such as where the marriage has not been consummated and the person deceived is exceptionally vulnerable to deception because of youth, *Ysern v. Horter*, 91 *N. J. Eq.* 189, 110 *A.* 31; *Brown v. Scott*, 140 *Md.* 258, 117 *A.* 114, 22 *A. L. R.* 810; or because of age, *Entsminger v. Entsminger*, 99 *Kan.* 362, 161 *P.* 607. These exceptions are of no significance here.

The classic expression of the rationale of the general principle appears in the leading case of *Reynolds v. Reynolds, supra:* "* * * as mere incontinence in a woman prior to her entrance into the marriage contract, not resulting in pregnancy, does not necessarily prevent her from being a faithful wife, or from bearing to her husband the pure offspring of his loins, there seems to be no sufficient reason for holding misrepresentation or concealment on the subject of chastity to be such a fraud as to afford a valid ground for declaring a consummated marriage void. In regard to continence, as well as to other personal traits and attributes of character, it is the duty of a party to make due inquiry before hand, and not to ask the law to relieve him from a position into which his own indiscretion or want of diligence has led him. Certainly it would lead to disastrous consequences if a woman who had once fallen from virtue could not be per-

mitted to represent herself as continent, and thus restore herself to the rights and privileges of her sex, and enter into matrimony without incurring the risk of being put away by her husband on discovery of her previous immorality. Such a doctrine is inconsistent with reason and a wise and sound policy. * * *."

The binding effect of these principles is further tightened by the law where, as in the pending case, the husband had participated in the immorality of which he complains, and, therefore, had due notice of it prior to marriage. *Lindquist v. Lindquist, supra; Seilheimer v. Seilheimer,* 40 *N. J. Eq.* 412, 2 *A.* 376, 377. In further explanation of the doctrine, I may say, also, that for many years past, the law has rejected the idea of a double standard in such matters. "If ante-nuptial incontinence be a sufficient ground of nullity as against the woman, it is not easy to see why it should not be so likewise against the man, and the consequences of such a doctrine is not difficult to predict." *Allen's Appeal,* (1882) 99 *Pa.* 196, 201.

 The plaintiff urges that the established rules regarding premarital unchastity are inapplicable where the deceptive wife has been not only unchaste but also meretricious. I cannot agree with this contention. The law recognizes no such distinction between promiscuity and meretriciousness. 1 *Bishop on Marriage, Divorce & Separation,* 205, § 479; *Allen's Appeal, supra; Lindquist v. Lindquist, supra; Rosenberger v. Rosenberger,* 150 *Ky.* 803, 150 *S. W.* 1023.

 It is held, therefore, that the defendant's alleged premarital concealments and misrepresentations as to moral conduct and character do not go to the essentials of the marriage and, therefore, do not amount to fraud sufficient to justify annulment under the law of Delaware. It follows that the defendant's alleged concealments and misrepresentations as to source of her funds do not constitute fraud under our law.

 The other fraudulent misrepresentations asserted by the plaintiff merit little discussion under Delaware law. Mani-

festly, false vows of love and affection, in and of themselves, do not amount to fraud under our annulment law where the marriage has been consummated and marital duties and obligations have been performed for almost two years. Also without merit under Delaware law is the alleged misrepresentation regarding the validity of the defendant's Texas divorce. The decree was valid at the time of the marriage and is valid now. As has been shown, the decree is, at most, voidable and not void and, therefore, is valid until judicially declared otherwise in a direct proceeding. The plaintiff bases this contention upon the possibility that the decree may, at some future time, be successfully impeached for fraud and collusion. Wigley, a party to the alleged collusion, could not attack it on that ground. *De Beque v. Ligon,* *Tex. Civ. App.,* 286 *S. W.* 749; *Moor v. Moor, Tex. Civ. App.,* 63 *S. W.* 347; 27 *C. J. S., Divorce,* § 171b, *page* 816. The Texas Court may not, on its own motion, impeach the decree on that ground after the end of the term at which it was granted. *Mitchell v. Mitchell, Tex. Civ. App.,* 199 *S. W.* 2d 699. And, in any event, a Texas four year statute of limitations now bars any direct attack upon this judgment. *Litton v. Waters, Tex. Civ. App.,* 161 *S. W.* 2d 1095; 15 *Tex. Juris.* 564. The plaintiff cites *Wemple v. Wemple,* 170 *Minn.* 305, 212 *N. W.* 808, 58 *A. L. R.* 321, in support of his contention that a representation of this nature is fraud concerning the essentials of the marriage. That case is not applicable because there the wife pretended that she had a divorce decree when, in fact, she had none. It is clear that this allegation of fraudulent misrepresentation is nebulous and that it does not meet the test established by *Williams v. Williams, supra.*

Finally, the plaintiff states that he "is entitled to annulment as in a direct action for fraud", citing *Murphy v. T. B. O'Toole, Inc.,* 6 *Terry* 540, 76 *A.* 2d 313. I find this contention to be without substance.

For the reasons stated, the petition must be dismissed.

*On Motion for Reargument*

 On December 7, 1951, the plaintiff filed a motion for reargument on the ground that *Cook v. Cook*, (1951) 72 *S. Ct.* 157, demonstrates that this Court erred in holding that *Johnson v. Muelberger*, 340 *U. S.* 581, 71 *S. Ct.* 474, 95 *L. Ed.* 552 is controlling with regard to the faith and credit which must be accorded by this Court to the defendant's Texas divorce decree.

The *Cook* case intimates that a putative husband may collaterally attack his wife's out-of-state divorce decree if the defendant spouse in the divorce action had not been served personally or had not entered a personal appearance in the divorce forum; and that, under such circumstances, the right of the putative husband to make such an attack is not conditioned upon his being able to make a similar attack in the courts of the granting State.

I interpret the *Cook* case to be an indication of a limitation to be placed upon the doctrine of the *Johnson* case. As I read the two cases, if the divorce court had jurisdiction over the person of the defendant in the divorce action, then the defendant spouse, as well as a stranger, is barred from collaterally attacking the decree in another State if he would not be permitted to make a collateral attack in the granting State; on the other hand, if the divorce court did not have personal jurisdiction over the defendant spouse, then, in that event, either the defendant spouse or a stranger may collaterally attack the decree in another State without regard for the ability to do so in the granting State. The latter rule is founded, I assume, upon the proposition that a decree granted by a court without jurisdiction over the person of the defendant is a nullity, and the full faith and credit requirement is not imposed in the case of a judgment or decree entered without jurisdiction.

In the case at bar, as in the *Johnson* case, the defendant

spouse had entered a personal appearance in the divorce action[7]. The implications contained in the *Cook* case are not applicable under such circumstances because there the Court was merely indicating a possible course of action in the event that such personal jurisdiction were not found.

As I see it, the combined effect of the *Johnson* case and the *Cook* case is to place a stranger to the divorce proceeding in the very same position, insofar as the Full Faith and Credit Clause is concerned, as is the spouse named defendant in the divorce action. If the defendant in the divorce case was served personally or entered a personal appearance, neither he nor a stranger may collaterally attack the divorce decree unless the State in which the decree was granted would permit a similar attack in its own courts. *Johnson v. Muelberger, supra.* If, however, the defendant in the divorce action was not served personally or did not enter a personal appearance, then either the defendant spouse or a stranger may collaterally attack the decree without regard for the right to do so in the granting State. *Cook v. Cook, supra.* This result was inevitable. Surely, it cannot be the law that, given the same jurisdictional facts, two persons are married when the interests of strangers are in question but divorced when either of them makes the challenge.

In the *Cook* case, 72 *S. Ct.* at page 160, it is stated: "* * *. We also reserve the question, discussed on argument, whether

---

[7]Wigley had submitted himself to the jurisdiction of the Texas Court in the divorce action, brought there by the defendant in the case *sub judice*, by a general appearance and waiver which reads as follows:

"No. 16551—In The 74th District Court of McLennan County, Texas.

"To The Honorable Judge of Said Court:

"Now Comes W. R. Wigley, Defendant in the above entitled and numbered cause, and hereby waives the service of citation upon him herein and places himself in Court for all purposes and agrees that this cause may be tried at any regular term of the Court.

"Witness My Hand this the 13th day of June, A.D. 1940.

"/s/ W. R. Wigley

Defendant."

respondent [putative husband] would now be in a position to attack the Florida decree collaterally if it were found to be collusive and he participated in the fraud."

This language does not indicate, as the plaintiff urges, that the Supreme Court is expressly reserving the general question as to whether a decree obtained by a collusive agreement is protected by the Full Faith and Credit Clause. By the quoted language, the Supreme Court is stating only that if it is found, upon remand, that the divorce court did not have personal jurisdiction over the defendant in the divorce proceeding and if, for that reason, the decree is open to collateral attack by the putative husband, then, upon the presentation of the *Cook* case in that status, the Court may have for consideration the effect of the so-called "clean hands" doctrine upon the right of the putative husband to make the attack.

The *Cook* case shows, as does the *Johnson* case, that if personal service is made upon the defendant in the divorce proceeding, or if he enters a personal appearance, the existence of fraud, even as to jurisdiction, does not deprive a decree of the protection of the Full Faith and Credit Clause and of the Statute implementing the Clause. In the *Johnson* case, [340 *U. S.* 581, 71 S.Ct. 477.] Mr. Justice Reed wrote: "It is clear from the foregoing that, under our decisions, a state by virtue of the clause must give full faith and credit to an out-of-state divorce by barring either party to that divorce who has been personally served or who has entered a personal appearance from collaterally attacking the decree." And, in the *Cook* case, at page 159 of 72 *S. Ct.*, Mr. Justice Douglas wrote: "If the defendant spouse appeared in the Florida proceedings and contested the issue of the wife's domicile, *Sherrer v. Sherrer*, 334 *U. S.* 343, 68 *S. Ct.* 1087, 1097, 92 *L. Ed.* 1429, or appeared and admitted her Florida domicile, *Coe v. Coe*, 334 *U. S.* 378, 68 *S. Ct.* 1094, 92 *L. Ed.* 1451, or was personally served in the divorce state, *Johnson v. Muelberger*, 340 *U. S.* 581, 587, 71 *S. Ct.* 474, 477, 95 *L. Ed.* 552, he would be barred from attacking the decree collaterally;

\* \* \*."[8] This language is clear and unequivocal; the application of the Full Faith and Credit Clause does not depend upon "a true adversary proceeding." Compare *Staedler v. Staedler*, 6 *N. J.* 380, 78 *A.* 2d 896; *Brasier v. Brasier*, 200 *Okl.* 689, 200 *P.* 2d 427.

If a divorce decree must be recognized as enforceable even though procured by fraud as to jurisdiction, certainly fraud and collusion as to the merits of the action will not deprive a decree of the protection of the Full Faith and Credit Clause.

I do not think that I err in considering *Johnson v. Muelberger, supra,* to be controlling in the phase of the case to which I have applied it.

---

[8]In his dissent in the *Cook* case, 72 *S. Ct. page* 161, Mr. Justice Frankfurter stated: "It is inconceivable that the Vermont courts did not know that the fraudulent claim of domicile by a divorcing spouse is irrelevant to the enforceability in sister States of a decree of divorce if the other spouse contests or consents to the proceeding leading to the decree."